# SUPREME COURT OF THE UNITED STATES

## DAVID BOBBY, WARDEN *v.* ARCHIE DIXON

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 10–1540.   Decided November 7, 2011

PER CURIAM.

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington* v. *Richter*, 562 U. S. ___, ___ (2011) (slip op., at 13). The Court of Appeals for the Sixth Circuit purported to identify three such grievous errors in the Ohio Supreme Court's affirmance of respondent Archie Dixon's murder conviction. Because it is not clear that the Ohio Supreme Court erred at all, much less erred so transparently that no fairminded jurist could agree with that court's decision, the Sixth Circuit's judgment must be reversed.

*     *     *

Archie Dixon and Tim Hoffner murdered Chris Hammer in order to steal his car. Dixon and Hoffner beat Hammer, tied him up, and buried him alive, pushing the struggling Hammer down into his grave while they shoveled dirt on top of him. Dixon then used Hammer's birth certificate and social security card to obtain a state identification card in Hammer's name. After using that identification card to establish ownership of Hammer's car, Dixon sold the vehicle for $2,800.

Hammer's mother reported her son missing the day after his murder. While investigating Hammer's disap-

pearance, police had various encounters with Dixon, three of which are relevant here. On November 4, 1993, a police detective spoke with Dixon at a local police station. It is undisputed that this was a chance encounter—Dixon was apparently visiting the police station to retrieve his own car, which had been impounded for a traffic violation. The detective issued *Miranda* warnings to Dixon and then asked to talk to him about Hammer's disappearance. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Dixon declined to answer questions without his lawyer present and left the station.

As their investigation continued, police determined that Dixon had sold Hammer's car and forged Hammer's signature when cashing the check he received in that sale. Police arrested Dixon for forgery on the morning of November 9. Beginning at 11:30 a.m. detectives intermittently interrogated Dixon over several hours, speaking with him for about 45 minutes total. Prior to the interrogation, the detectives had decided not to provide Dixon with *Miranda* warnings for fear that Dixon would again refuse to speak with them.

Dixon readily admitted to obtaining the identification card in Hammer's name and signing Hammer's name on the check, but said that Hammer had given him permission to sell the car. Dixon claimed not to know where Hammer was, although he said he thought Hammer might have left for Tennessee. The detectives challenged the plausibility of Dixon's tale and told Dixon that Tim Hoffner was providing them more useful information. At one point a detective told Dixon that "now is the time to say" whether he had any involvement in Hammer's disappearance because "if Tim starts cutting a deal over there, this is kinda like, a bus leaving. The first one that gets on it is the only one that's gonna get on." App. to Pet. for Cert. 183a. Dixon responded that, if Hoffner knew anything about Hammer's disappearance, Hoffner had not

told him. Dixon insisted that he had told police everything he knew and that he had "[n]othing whatsoever" to do with Hammer's disappearance. *Id.*, at 186a. At approximately 3:30 p.m. the interrogation concluded, and the detectives brought Dixon to a correctional facility where he was booked on a forgery charge.

The same afternoon, Hoffner led police to Hammer's grave. Hoffner claimed that Dixon had told him that Hammer was buried there. After concluding their interview with Hoffner and releasing him, the police had Dixon transported back to the police station.

Dixon arrived at the police station at about 7:30 p.m. Prior to any police questioning, Dixon stated that he had heard the police had found a body and asked whether Hoffner was in custody. The police told Dixon that Hoffner was not, at which point Dixon said, "I talked to my attorney, and I want to tell you what happened." *State* v. *Dixon*, 101 Ohio St. 3d 328, 331, 2004–Ohio–1585, 805 N. E. 2d 1042, 1050. The police read Dixon his *Miranda* rights, obtained a signed waiver of those rights, and spoke with Dixon for about half an hour. At 8 p.m. the police, now using a tape recorder, again advised Dixon of his *Miranda* rights. In a detailed confession, Dixon admitted to murdering Hammer but attempted to pin the lion's share of the blame on Hoffner.

At Dixon's trial, the Ohio trial court excluded both Dixon's initial confession to forgery and his later confession to murder. The State took an interlocutory appeal. The State did not dispute that Dixon's forgery confession was properly suppressed, but argued that the murder confession was admissible because Dixon had received *Miranda* warnings prior to that confession. The Ohio Court of Appeals agreed and allowed Dixon's murder confession to be admitted as evidence. Dixon was convicted of murder, kidnaping, robbery, and forgery, and sentenced to death.

Per Curiam

The Ohio Supreme Court affirmed Dixon's convictions and sentence. To analyze the admissibility of Dixon's murder confession, the court applied *Oregon* v. *Elstad*, 470 U. S. 298 (1985). The Ohio Supreme Court found that Dixon's confession to murder after receiving *Miranda* warnings was admissible because that confession and his prior, unwarned confession to forgery were both voluntary. *State* v. *Dixon*, *supra*, at 332–334, 805 N. E. 2d, at 1050–1052; see *Elstad*, *supra*, at 318 ("We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings").

Dixon then filed a petition for a writ of habeas corpus under 28 U. S. C. §2254 in the U. S. District Court for the Northern District of Ohio. Dixon claimed, *inter alia*, that the state court decisions allowing the admission of his murder confession contravened clearly established federal law. The District Court denied relief, but a divided panel of the Sixth Circuit reversed. *Dixon* v. *Houk*, 627 F. 3d 553 (2010).

The Sixth Circuit had authority to issue the writ of habeas corpus only if the Ohio Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," as set forth in this Court's holdings, or was "based on an unreasonable determination of the facts" in light of the state court record. §2254(d); see *Harrington*, 562 U. S., at ___ (slip op., at 10). The Sixth Circuit believed that the Ohio Supreme Court's decision contained three such egregious errors.

First, according to the Sixth Circuit, the *Miranda* decision itself clearly established that police could not speak to Dixon on November 9, because on November 4 Dixon had refused to speak to police without his lawyer. That is plainly wrong. It is undisputed that Dixon was not in custody during his chance encounter with police on No-

vember 4. And this Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *McNeil* v. *Wisconsin*, 501 U. S. 171, 182, n. 3 (1991); see also *Montejo* v. *Louisiana*, 556 U. S. 778, \_\_\_ (2009) (slip. op., at 16) ("If the defendant is not in custody then [*Miranda* and its progeny] do not apply").

Second, the Sixth Circuit held that police violated the Fifth Amendment by urging Dixon to "cut a deal" before his accomplice Hoffner did so.[1] The Sixth Circuit cited no precedent of this Court—or any court—holding that this common police tactic is unconstitutional. Cf., *e.g.*, *Elstad*, *supra*, at 317 ("[T]he Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily"). Because no holding of this Court suggests, much less clearly establishes, that police may not urge a suspect to confess before another suspect does so, the Sixth Circuit had no authority to issue the writ on this ground.[2]

––––––––––

[1] In the Sixth Circuit's view, the Ohio Supreme Court's contrary conclusion that Dixon's confession was voluntary "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d)(2). The Sixth Circuit did not, however, purport to identify any mistaken factual finding. It differed with the Ohio Supreme Court only on the ultimate characterization of Dixon's confession as voluntary, and this Court's cases make clear that "the ultimate issue of 'voluntariness' is a legal question." *Miller* v. *Fenton*, 474 U. S. 104, 110 (1985); see also *Arizona* v. *Fulminante*, 499 U. S. 279, 287 (1991). This Court therefore addresses the question the Sixth Circuit should have addressed: whether the Ohio Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." §2254(d)(1).

[2] The only case the Sixth Circuit cited on this issue was *Mincey* v. *Arizona*, 437 U. S. 385 (1978). *Mincey* involved the "virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness" who was in a hospital's intensive care unit and who

Third, the Sixth Circuit held that the Ohio Supreme Court unreasonably applied this Court's precedent in *Elstad*. In that case, a suspect who had not received *Miranda* warnings confessed to burglary as police took him into custody. Approximately an hour later, after he had received *Miranda* warnings, the suspect again confessed to the same burglary. This Court held that the later, warned confession was admissible because "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second [warned] statement was also voluntarily made." 470 U. S., at 318 (footnote omitted).

As the Ohio Supreme Court's opinion explained, the circumstances surrounding Dixon's interrogations demonstrate that his statements were voluntary. During Dixon's first interrogation, he received several breaks, was given water and offered food, and was not abused or threatened. He freely acknowledged that he had forged Hammer's name, even stating that the police were "welcome" to that information, and he had no difficulty denying that he had anything to do with Hammer's disappearance. *State* v. *Dixon*, 101 Ohio St. 3d, at 331, 805 N. E. 2d, at 1049. Prior to his second interrogation, Dixon made an unsolicited declaration that he had spoken with his attorney and wanted to tell the police what had happened to Hammer. Then, before giving his taped confession, Dixon twice received *Miranda* warnings and signed a waiver-of-rights form which stated that he was acting of his own free will.

––––––––––

"clearly expressed his wish not to be interrogated" while in a "debilitated and helpless condition." *Id.*, at 399–401. There is simply nothing in the facts or reasoning of *Mincey* suggesting that any of Dixon's statements were involuntary.

The Ohio Supreme Court recognized that Dixon's first interrogation involved "an intentional *Miranda* violation." The court concluded, however, that "as in *Elstad*, the breach of the *Miranda* procedures here involved no actual compulsion" and thus there was no reason to suppress Dixon's later, warned confession. 101 Ohio St. 3d, at 334, 805 N. E. 2d, at 1052 (citing *Elstad, supra,* at 318).

The Sixth Circuit disagreed, believing that Dixon's confession was inadmissible under *Elstad* because it was the product of a "deliberate question-first, warn-later strategy." 627 F. 3d, at 557. In so holding, the Sixth Circuit relied heavily on this Court's decision in *Missouri* v. *Seibert,* 542 U. S. 600 (2004).[3] In *Seibert,* police employed a two-step strategy to reduce the effect of *Miranda* warnings: A detective exhaustively questioned Seibert until she confessed to murder and then, after a 15- to 20-minute break, gave Seibert *Miranda* warnings and led her to repeat her prior confession. 542 U. S., at 604–606, 616 (plurality opinion). The Court held that Seibert's second confession was inadmissible as evidence against her even though it was preceded by a *Miranda* warning. A plurality of the Court reasoned that "[u]pon hearing warnings only in the aftermath of interrogation and just after mak-

―――――――

[3] *Seibert* was not decided until after the Ohio Supreme Court's opinion in this case, but was issued before this Court denied Dixon's petition for certiorari seeking review of the Ohio Supreme Court's decision. It is thus an open question whether *Seibert* was "clearly established Federal law" for purposes of §2254(d). See *Smith* v. *Spisak,* 558 U. S. ___, ___ (2010) (slip op., at 3). It is not necessary to decide that question here because *Seibert* is entirely consistent with the Ohio Supreme Court's decision. Thus, if *Seibert* was clearly established law, the Ohio Supreme Court's decision was not "contrary to" or "an unreasonable application of" *Seibert.* §2254(d). And if *Seibert* was not clearly established law, *Seibert*'s explication of *Elstad* further demonstrates that the Ohio Supreme Court's decision was not contrary to or an unreasonable application of *Elstad.*

ing a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." 542 U. S., at 613; see also *id.,* at 615 (detailing a "series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object"). JUSTICE KENNEDY concurred in the judgment, noting he "would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.,* at 622.

In this case, no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received. In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." 542 U. S., at 616–617 (plurality opinion). But in this case Dixon steadfastly maintained during his first, unwarned interrogation that he had "[n]othing whatsoever" to do with Hammer's disappearance. App. to Pet. for Cert. 186a. Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, Dixon *contradicted* his prior unwarned statements when he confessed to Hammer's murder. Nor is there any evidence that police used Dixon's earlier admission to forgery to induce him to waive his right to silence later: Dixon declared his desire to tell police what happened to Hammer before the second interrogation session even began. As the Ohio Supreme Court reasonably concluded, there was simply "no nexus" between Dixon's unwarned admission to forgery and his later, warned confession to murder. 101 Ohio St. 3d, at 333, 805 N. E. 2d, at 1051.

Per Curiam

Moreover, in *Seibert* the Court was concerned that the *Miranda* warnings did not "effectively advise the suspect that he had a real choice about giving an admissible statement" because the unwarned and warned interrogations blended into one "continuum." 542 U. S., at 612, 617. Given all the circumstances of this case, that is not so here. Four hours passed between Dixon's unwarned interrogation and his receipt of *Miranda* rights, during which time he traveled from the police station to a separate jail and back again; claimed to have spoken to his lawyer; and learned that police were talking to his accomplice and had found Hammer's body. Things had changed. Under *Seibert*, this significant break in time and dramatic change in circumstances created "a new and distinct experience," ensuring that Dixon's prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing to Hammer's murder. 542 U. S., at 615; see also *id.*, at 622 (KENNEDY, J., concurring in judgment) ("For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn").[4]

The admission of Dixon's murder confession was consistent with this Court's precedents: Dixon received *Mi-*

---

[4] The Sixth Circuit also concluded that "the Ohio Supreme Court erroneously placed the burden of proof on Dixon to prove that his confession was coerced." *Dixon* v. *Houk*, 627 F. 3d 553, 558 (2010). But the Ohio Supreme Court clearly said that "the state carries the burden of proving voluntariness." *State* v. *Dixon*, 101 Ohio St. 3d 328, 332, 2004–Ohio–1585, 805 N. E. 2d 1042, 1050. That the court's opinion discusses the absence of evidence of coerciveness alongside the affirmative evidence of voluntariness in no way indicates that the court shifted the burden onto Dixon.

*randa* warnings before confessing to Hammer's murder; the effectiveness of those warnings was not impaired by the sort of "two-step interrogation technique" condemned in *Seibert;* and there is no evidence that any of Dixon's statements was the product of actual coercion. That does not excuse the detectives' decision not to give Dixon *Miranda* warnings before his first interrogation. But the Ohio courts recognized that failure and imposed the appropriate remedy: exclusion of Dixon's forgery confession and the attendant statements given without the benefit of *Miranda* warnings. Because no precedent of this Court required Ohio to do more, the Sixth Circuit was without authority to overturn the reasoned judgment of the State's highest court.

The petition for a writ of certiorari and respondent's motion to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*