[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 27, 2011
JOHN LEY
CLERK

No. 11-11159
Non-Argument Calendar

_____

D.C. Docket No. 3:08-cv-00076-TJC-JRK

CARLTON LUMPKINS,

Petitioner-Appellant,

versus

SECRETARY DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 27, 2011)

Before CARNES, HULL and FAY, Circuit Judges.

PER CURIAM:

Carlton Lumpkins, a Florida prisoner proceeding pro se, appeals the district court's denial of his habeas petition under 28 U.S.C. § 2254. After review, we affirm.

## I. BACKGROUND

Petitioner Lumpkins had a brother, Marvin Lumpkins, who was murdered on September 19, 2002. A week later, allegedly in retaliation for Marvin's murder, a drive-by shooting killed Johnnie Gatlin, Deon Kirkland, and Christopher Kirkland (the "Gatlin–Kirkland murders"). On October 4, 2002, Petitioner Lumpkins confessed to his involvement in the Gatlin–Kirkland murders.

In the state court trial in 2005, the State introduced Lumpkins's confession, along with other evidence. The State also introduced a videotaped confession of Lumpkins's codefendant, Maurice Silas, who also testified and identified himself and Lumpkins as the gunmen in the drive-by shooting. The jury convicted Lumpkins, who is now serving a life sentence on his three murder convictions.

In 2008, Lumpkins filed this § 2254 petition asserting, inter alia, that his confession was obtained in violation of his Fifth and Fourteenth Amendment rights and that his state murder convictions should be vacated. Because the sole

issue before us involves Lumpkins's confession, we detail the evidence and the state trial court's findings about his confession.

## II. SUPPRESSION HEARING BEFORE THE STATE TRIAL COURT

Before trial, Lumpkins moved to suppress his confession.[1] At a two-day suppression hearing, the State submitted the following testimony and evidence. In an October 2, 2002 videotaped statement to the police, Maurice Silas confessed to the September 29, 2002 Gatlin–Kirkland murders. On the videotape, Silas stated that Petitioner Lumpkins was the other shooter and Latroy Bouknight was the driver of the vehicle used in this drive-by shooting.

On October 3, 2002, Sheriff's Detective Guy Weber was on patrol in an unmarked car. Detective Weber was instructed to locate Lumpkins and ask if Lumpkins would come voluntarily to the sheriff's office. Weber was instructed not to arrest Lumpkins and not to force Lumpkins to come to the sheriff's office. Weber and his partner drove around looking for Lumpkins and located his vehicle. Weber began following the vehicle with the intention of calling for a marked police vehicle to conduct a traffic stop, but Lumpkins's vehicle eventually pulled to the side of the road and stopped without Weber's initiating a traffic stop.

___

[1] Lumpkins filed both an original and an amended motion to suppress. The state trial court considered both motions. For purposes of this § 2254 petition, we consider the motions together and refer to them as a single motion to suppress.

Sheriff's Detective Weber approached the vehicle, where Lumpkins sat in the passenger seat. A woman named Gabrielle Solomon was the driver. Lumpkins voluntarily agreed to accompany Weber to the sheriff's office. Weber transported Lumpkins to the sheriff's office in his unmarked vehicle, which did not contain a cage. Weber did not handcuff Lumpkins, did not read him his Miranda warnings, did not ask him any questions, and did not tell him that he was in custody. Weber and Lumpkins arrived at the sheriff's office around 12:30 p.m.

## A. First Interview About Marvin's Murder

Around 12:45 p.m., Detective David Meacham, a homicide detective investigating Marvin's murder, met Lumpkins in an interview room at the sheriff's office. For approximately 45 minutes, Detective Meacham and another detective interviewed Lumpkins about Marvin's murder. The interview was videotaped. Meacham did not read Lumpkins his Miranda warnings because he was interviewing Lumpkins only about his brother Marvin's murder.

During the interview, Lumpkins identified Marvin's killer in a photospread and stated that the killer was nicknamed "C." Detective Meacham neither believed Lumpkins was in custody nor told Lumpkins that he was in custody.

## B. Second Interview About the Gatlin–Kirkland Murders

At approximately 1:53 p.m., Detectives Shawn Coarsey and Robert Nelson,

4

the lead detectives on the Gatlin–Kirkland murders, entered the interview room. Detective Nelson read Lumpkins his Miranda rights. Lumpkins signed a form acknowledging that he read and understood his Miranda rights.

For about an hour and a half, Detectives Nelson and Coarsey questioned Lumpkins about the Gatlin–Kirkland murders. The detectives then took a break to allow Lumpkins to use the restroom. Neither officer threatened Lumpkins or promised him anything in return for making any statements.

After the bathroom break and around 3:30 p.m., the interview continued and Lumpkins gave the names of several family members who were his alibi witnesses. Detective Nelson responded that it would take time to locate the witnesses, and Lumpkins agreed to wait while the detectives located his alibi witnesses. The detectives left the interview room around 6:00 p.m.

At 6:20 p.m. the detectives returned to the interview room and showed Lumpkins Silas's videotaped confession incriminating Lumpkins as the other shooter. The detectives then left. At 6:50 p.m., someone brought Lumpkins food.

At 8:00 p.m., Detective Nelson returned and continued to question Lumpkins, who continued to deny involvement in the shooting. This second part of the questioning about the Gatlin–Kirkland murders was videotaped. Detective Nelson confirmed that Lumpkins had read and understood his constitutional

5

rights.

Detective Nelson then confronted Lumpkins with the discrepancies in his alibi. During the interview, Lumpkins several times indicated that if the police were going to arrest him, then the police should go ahead and take him on to jail and he was "through with this." Throughout, Lumpkins continuously talked to Detective Nelson. When Detective Nelson got up to leave, Lumpkins said implicitly about the murders: "It's over with. What happened, it just happened. I'm through with it man. I'm through with it. Take me on to jail, man." During the entire interview, Lumpkins never explicitly stated that he did not want to talk to the police or that he did not want to talk to Detective Nelson. Rather, the tenor of the overall colloquy was Detective Nelson's saying to Lumpkins, "I know you're involved," and Lumpkins's denying involvement in the shootings and in effect trying to call Detective Nelson's bluff by saying just go ahead and arrest me then if you don't believe me.

Between approximately 9:00 p.m. and 2:30 a.m., the detectives interviewed other witnesses and allowed Lumpkins to sleep and use the restroom. Eventually, Lumpkins's sister, Dora Lumpkins Gettis, told one detective that Lumpkins had admitted to her that he was involved in the Gatlin–Kirkland murders.

Around 2:30 a.m., Detective Nelson and another detective returned to the

6

interview room, accompanied by Gettis, because they wanted Gettis to tell Lumpkins what she had told the detectives. According to Detective Nelson, Gettis told Lumpkins that she had "told them what you told me," and then Lumpkins confessed. Gettis left the room, and there was a brief break in the questioning. At 3:40 a.m., Lumpkins confessed again on video and signed a statement. Detective Nelson testified that he never promised Lumpkins anything in return for the statement and never threatened Lumpkins. According to Detective Nelson, Lumpkins was advised of his constitutional rights, and Lumpkins never stated that he did not want to talk to the police and did not request an attorney.

## C. State Trial Court Findings

The state court denied the motion to suppress. In a subsequent written order, the state court found that Lumpkins voluntarily agreed to accompany Detective Weber to the sheriff's office and arrived at the sheriff's office around 12:30 p.m. At 1:53 p.m., after an interview about the murder of his brother, two other detectives entered the interview room to ask Lumpkins about the Gatlin–Kirkland murders. The detectives properly informed Lumpkins of his Miranda rights. The state court found that Lumpkins understood his Miranda rights, was not impaired, was not threatened or promised anything, and voluntarily spoke with the detectives. The court found that the interview about the

7

Gatlin–Kirkland murders initially lasted approximately an hour and a half.

The state court also found that the later interview concluded at 3:40 a.m. and that Lumpkins "was not illegally detained when he made those incriminating statements." Specifically, the court found that Lumpkins: (1) "had been in police custody from 10:30 A.M. on October 3, 2002 until 3:40 A.M. on October 4, 2002 . . . , a time period of approximately seventeen (17) hours"; (2) "was attempting to establish an alibi"; and (3) "remained at the police station voluntarily in an effort to convince the police that he was not involved in the shootings." The state court further found that the police (1) summoned several of Lumpkins's family members to the police station; (2) did not threaten the family members; and (3) did not attempt to influence the family members to pressure Lumpkins to confess.

The court also found that Lumpkins: (1) "never invoked any of the rights set-forth in his constitutional rights form"; (2) "never asked for an attorney"; and (3) made statements to the effect that he was through and that the detectives should take him to jail, but "he continued to talk to the detectives without specifically telling the detectives that he had decided to terminate the interrogation." Based on these findings, the state court concluded that the detectives were not required to terminate the interrogation. Finally, the court found that Lumpkins was never threatened with the death penalty in an attempt to

8

coerce a confession and that the police officers involved in the investigation had not engaged "in any unlawful activities so as to cause [Lumpkins's] statements to have been made involuntarily."

On direct appeal, Lumpkins challenged the denial of his motion to suppress, and Florida's First District Court of Appeal affirmed without a written opinion.

### III. DISTRICT COURT PROCEEDINGS

In 2008, Lumpkins timely filed this § 2254 petition.[2] His petition asserts, inter alia, that his confession was obtained in violation of the Fifth and Fourteenth Amendments because the detectives continued to interrogate him after he invoked his right to remain silent. The district court denied Lumpkins's petition with prejudice.

After noting that "it is difficult to ascertain at what time the interview of [Lumpkins] became a custodial interrogation," the district court declined to address this custody issue. Rather, the district court concluded that, even if Lumpkins was in custody, the state trial court reasonably found Lumpkins: (1) was "properly given his Miranda warnings"; (2) "voluntarily elected to waive his

---

[2] After his direct appeal, Lumpkins moved for relief under Rule 3.850 of the Florida Rules of Criminal Procedure. Florida's First District Court of Appeal denied Lumpkins's Rule 3.850 motion on the merits in October 2007 and denied rehearing in November 2007. Thus, Lumpkins's § 2254 petition was timely filed in 2008.

9

rights"; (3) "never made any unambiguous statements that could be construed as an invocation of his right to cease the questioning"; and (4) voluntarily confessed, based on the totality of the circumstances surrounding the interrogation. In particular, the district court concluded that the state court's determination—that Lumpkins failed to unambiguously assert his right to remain silent—involved neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented at the state court proceedings.[3]

## IV. STANDARD OF REVIEW

We review de novo the district court's denial of a § 2254 petition. Hall v. Thomas, 611 F.3d 1259, 1284 (11th Cir. 2010). Under § 2254(d), a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits of the issue was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

---

[3] The district court granted a certificate of appealability only as to the confession claim in Lumpkins's § 2254 petition.

10

"[A]n <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law.  Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  <u>Renico v. Lett</u>, 559 U.S. __, 130 S.Ct. 1855, 1862 (2010) (quotation marks omitted).  The Supreme Court repeatedly has admonished that "[t]he petitioner carries the burden of proof" and that the § 2254(d)(1) standard is "a difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  <u>Cullen v. Pinholster</u>, 563 U.S. __, 131 S. Ct. 1388, 1398 (2011) (quotation marks omitted).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), <u>codified in</u> 28 U.S.C. § 2254, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was <u>an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement</u>.'"  <u>Bobby v. Dixon</u>, 565 U.S. __, __ S. Ct. __, 2011 WL 5299458, No. 10-1540, slip op. at 1 (U.S. Nov. 7, 2011) (quoting <u>Harrington v. Richter</u>, 562 U.S. __, 131 S. Ct. 770, 786–87 (2011)).  In other words, we cannot grant relief unless Lumpkins can show that "no fairminded jurist

11

could agree with that [state] court's decision." See id.

## V. DISCUSSION

Lumpkins argues that the state trial court's denial of his motion to suppress his confession was based on an unreasonable determination of the facts and involved an unreasonable application of clearly established federal law, namely, Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966), and its progeny. Lumpkins does not dispute that he was given and understood his Miranda rights, and he does not claim that he asked for an attorney. Rather, Lumpkins argues that the police continued to question him despite his specific request to terminate the interrogation. Lumpkins also argues that his confession was involuntary because the interrogation in its entirety lasted 17 hours and the police used his sister to "cajole" him into confessing.

Under Miranda, the state must—prior to initiating any interrogation of a suspect—warn the suspect in police custody of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation. Berghuis v. Thompkins, 560 U.S. __, 130 S. Ct. 2250, 2259–60 (2010). If, during custodial interrogation, a suspect indicates that he wishes to remain silent, the interrogation must cease. Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning'

13

was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 103–04, 96 S. Ct. 321, 326 (1975). Similarly, if an individual "states that he wants an attorney" during a custodial interrogation, the interrogation "must cease until an attorney is present." Miranda, 384 U.S. at 474, 86 S. Ct. at 1628.

On the other hand, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994). "Rather, the suspect must unambiguously request counsel." Id. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461–62, 114 S. Ct. at 2356.

Moreover, in Berghuis, the Supreme Court applied Davis's unambiguous rule to a suspect's invocation of the right to remain silent and held that a suspect must "unambiguously" invoke his right to remain silent. 130 S. Ct. at 2260. Because the suspect in Berghuis stated neither that he wanted to remain silent nor that he did not want to talk to the police, the Supreme Court held that the suspect failed unambiguously to invoke his right to remain silent. Id.

"The inquiry as to whether a suspect's invocation of his right to remain

14

silent was ambiguous or equivocal is an objective one." Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir. 1995). "A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." Id. (quotation marks omitted). Although "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself," the request "may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself." Smith v. Illinois, 469 U.S. 91, 99–100, 105 S. Ct. 490, 495 (1984). "Thus, the determination of whether a suspect's right to cut off questioning was scrupulously honored requires a case-by-case analysis." Medina, 59 F.3d at 1101 (alteration and quotation marks omitted).

Here, the state trial court's decision—denying Lumpkins's motion to suppress his confession—was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts. As the state court noted, Lumpkins never specifically told the detectives that he wanted or had decided to terminate the interrogation. Lumpkins's colloquy with the detectives, when placed in context, shows that Lumpkins was indicating that if the police were going to arrest him anyway, then they should go ahead and take him to jail

15

and he was "through with this." Given Lumpkins's unequivocal willingness to talk to the detectives throughout the interview, we cannot say that no "fairminded jurist could agree" with the state court's determination that Lumpkins never unambiguously invoked his right to remain silent. See Dixon, 2011 WL 5299458, No. 10-1540, slip. op. at 1.

We also conclude that the state court's determination that Lumpkins's confession was voluntary was supported by considerable evidence. As to length of the interrogation, the state court was not unreasonable in finding that the interview was extended in part because Lumpkins was attempting to establish his alibi. Lumpkins identified potential alibi witnesses and agreed to wait at the sheriff's office while the detectives located and interviewed the potential witnesses. The 17 hours thus included a 5 or 6 hour break while the detectives interviewed Lumpkins's alibi witnesses. Under these circumstances, the length of the interrogation did not render Lumpkins's confession involuntary.

Additionally, the state court was not unreasonable in finding that the detectives did not engage in any other "unlawful activities" so as to cause Lumpkins's statements to be involuntary. Lumpkins's sister, Gettis, agreed to talk to Lumpkins and to tell him that she already told the officers what he told her. The record contains no evidence that the police officers pressured Gettis to reveal

16

this information or that the police officers deployed Gettis's information in order to "cajole" Lumpkins into confessing. Additionally, although we can find several cases in which courts have held that preventing a suspect from interacting with his family may affect the voluntariness of a confession in certain circumstances,[4] we can find no case (and Lumpkins cites none) holding that, by allowing a suspect to talk to his family, the police improperly coerced a confession. We conclude that the state court was not unreasonable in concluding that, under the totality of the circumstances, Lumpkins voluntarily confessed to the Gatlin–Kirkland murders and that there was no violation of his Fifth and Fourteenth Amendment rights. Accordingly, we affirm the district court's denial of Lumpkins's § 2254 petition.

**AFFIRMED.**

---

[4] See, e.g., Blackburn v. Alabama, 361 U.S. 199, 206, 80 S. Ct. 274, 279–80 (1960) ("A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror."); Mincey v. Arizona, 437 U.S. 385, 401–02, 98 S. Ct. 2408, 2418 (1978) (holding that a suspect's statement was involuntary because the suspect "was weakened by pain and shock, isolated from his family, friends, and legal counsel, and barely conscious, [and] his will was simply overborne").

17