Filed 1/13/16  P. v. Mattos CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C076743 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF124426) |
| v. | |
| JAMES MATTHEW MATTOS, | |
| Defendant and Appellant. | |

The police found an emaciated, unresponsive, 70 pound, developmentally disabled 67-year-old man lying on his side in a filthy room with flies buzzing around, wearing only a full diaper with feces running down his leg.  He died in the hospital two weeks later.  Defendant James Matthew Mattos, his caretaker, admitted he was negligent but insists there is insufficient evidence to support the jury finding of second degree murder.  He also challenges the sufficiency of the evidence to support the jury finding that he embezzled funds intended for the care of the decedent, Cecil Wachholtz, because defendant's mother, not he, was the decedent's conservator who had a relationship of trust with the trustee, Wells Fargo Bank (Wells Fargo).  Finally, he contends he did not receive constitutionally adequate assistance of counsel because his lawyer failed to

1

challenge the admissibility of statements he made to the investigating police officers.  We affirm.

## I.  SUFFICIENCY OF THE EVIDENCE

In reporting the relevant facts from the entire record, we must draw all reasonable inferences in favor of the jury verdict.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  If we find evidence that is reasonable, credible, and of solid value, we must defer to the jury's determination of the facts and resist the temptation to superimpose our own assessment of the evidence.  (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)  Thus, we examine the evidence to determine whether there is the requisite substantial evidence to support the jury's findings of second degree murder and embezzlement of an elder by a caretaker.

**The Evidence**

We begin with the tragic end of Cecil's life.  The police account and the doctor's description of his cause of death paint a ghastly picture.  When emergency personnel entered defendant's dirty, cluttered trailer on October 13, 2012, they smelled urine and found Cecil as described above in a back bedroom on a bloodstained mattress.  He had open sores and flies "on top of" him.  The top of the toilet seat in the bathroom next to his bedroom was covered in fecal matter, cobwebs had formed in the corners of the shower, and a brown substance coated the tub and walls.

Cecil was transported to the hospital.  His body was covered in bedsores.  He was severely dehydrated, had been malnourished for weeks, and had a dangerously low body temperature.  His penis had sores and was emanating pus, a sign of a urethral infection.  He also had multiple lesions on his hands and feet.  He was suffering from acute renal failure, apparently caused by dehydration, and an inflammation of the liver.  The admitting physician opined that the extent of the bedsores and the degree of malnutrition indicated a lengthy period of neglect:  "This is something that at least over weeks, more likely many months, would occur."

Although he put on 50 pounds after admission to the hospital, Cecil died on October 27.  His attending physician testified that Cecil suffered from severe malnutrition, a urinary tract infection, pneumonia, acute renal failure, infection in his lungs and urine, heart failure, multiple bedsores, low body temperature, low blood pressure, low blood counts, blindness, diarrhea, bloody stools, and acute respiratory failure.  Most of these ailments, the physician opined, were caused by malnutrition and skin ulcers.

The physician who performed Cecil's autopsy testified the decedent had 12 bedsores, another 6 bedsores that were healed or nearly healed, and 11 healing fractures on his ribs.  He determined that death was caused by "[s]eptic shock due to aspiration pneumonia, urosepsis, and multiple decubitus ulcers which were due to complications of malnutrition and hypothermia."

How and why did Cecil's life end?  The prosecutor posited that his caretaker, defendant, was aware of Cecil's dire deterioration and consciously sought to hasten his demise by allowing him to rot away, pointing out that defendant had told his sister Cecil was just an old man dying.  The defense conceded defendant was negligent but maintained he did not entertain the requisite mental state for murder; that is, there was insufficient evidence of implied malice.  The record tells a different story, a story of how the money set aside in a trust by a generous uncle for the care of his disabled nephew was ultimately squandered and stolen by a distant relative, defendant, who had agreed to care for Cecil but consciously failed to feed him, bathe him, or obtain medical care for him.

Cecil's great-uncle by marriage took him into his home when Cecil was 17.  He cared for him and established a trust for his support and care after the great-uncle's death.  He bequeathed his house to defendant's mother and father on the condition they continue to care for Cecil.  After defendant's father died, his mother, Darlene Mattos, became Cecil's conservator.  By 2008 Darlene could no longer care for Cecil.  She bought her son, defendant, a trailer, and he agreed to care for Cecil.

The trust distributed $2,500 per month for Cecil's care based on an annual budget submitted to Wells Fargo by Darlene but prepared, in part, by defendant. Darlene transferred the monthly allocation to defendant. A budget submitted on August 11, 2009, requested monthly payments of $151 for medications and $62 for doctor visits. A budget submitted in March 2012 requested $1,000 for housing, $50 for home maintenance, $62.50 for utilities, $120 for medical expenses, $180 for prescriptions, $35 for vision expenses, and $600 for clothing.

Cecil suffered from hypertension. His physician testified she saw Cecil between 6 and 12 times from 2006 to 2008, prescribed two kinds of blood pressure medication for him, and informed defendant that Cecil needed regular checkups to monitor his blood pressure. She also referred him to a cardiologist for a twisted aorta.

The last prescription for Cecil was filled in 2009. Cecil never saw a cardiologist.

Darlene described Cecil as stubborn, picky, and resistant to bathing, chores, and medical treatment. Others described him as friendly. He was an active member of the Moose lodge for many years and rode his bike around town after the lodge closed.

About three months before he was hospitalized, Cecil began wearing adult diapers and appeared to be going blind. He fell regularly. Defendant told his mother that Cecil said he only wanted to eat one meal a day. She encouraged defendant to give him two meals daily. Defendant told the investigating police officers he fed Cecil soup. For the most part, Cecil had stopped feeding himself. Defendant asked a representative of Wells Fargo to approve an additional expenditure to hire a family friend to help care for Cecil. When the representative told him the caretaker would have to be licensed or hired under a payroll service, defendant became angry and hung up the phone. Defendant did not take Cecil to the doctor when his health began to deteriorate. He admitted it had been two or three years since Cecil had been to a doctor, and Cecil had not eaten much in the week before he was hospitalized. He insisted he changed Cecil's diaper "all the time."

4

There was $226,000 in the trust at the time of Cecil's death. Defendant and his siblings were remainder beneficiaries of the trust. Defendant and his brother Edward both called Wells Fargo shortly after Cecil's death to inquire about their inheritances.

**Sufficiency of the Evidence to Support Second Degree Murder**

Defendant concedes he failed to reasonably care for Cecil and thus was negligent, but he insists he did not endanger Cecil with a conscious disregard for his life. In his view, the evidence of implied malice is insufficient to support the jury verdict. He argues on appeal, as he did to the jury, that he too lived in the same squalid conditions as Cecil, as though a messy house was all the evidence revealed. He points out he had no medical training and therefore did not recognize the severity of the symptoms; he believed Cecil was showing signs of aging. Moreover, he argues the evidence demonstrates that he attempted to help Cecil by asking for advice from his mother and sister, both of whom were medically trained, and by calling for emergency personnel when Cecil became unresponsive. It was the jury's prerogative to accept this narrative, the same narrative his lawyer argued at trial. But defendant ignores the abundance of evidence from which the jury could reasonably infer the requisite mental state for murder and our responsibility to defer to the jury's assessment of that evidence.

Murder is the unlawful killing of a human being with malice. (Pen. Code, § 187, subd. (a).) Malice may be implied. "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) "The 'omission of a duty is in law the equivalent of an act . . .' [citation], and thus, a defendant's failure to perform an act that he or she has a legal duty to perform is identical to the defendant's affirmative performance of an act . . . ." (*People v. Latham* (2012) 203 Cal.App.4th 319, 327.)

5

The jury saw a videotape of the conditions under which this 70 pound, developmentally disabled man was found in defendant's trailer and heard testimony that he was clothed only in a diaper full of feces, which was also running down his leg. He was covered in skin ulcers and lying on a stained mattress without sheets. The emergency room doctor who treated Cecil testified that it would have taken a long time, several weeks, for Cecil to have deteriorated to that point. The jury certainly could infer from the physical evidence alone that defendant, Cecil's exclusive caretaker, saw this pathetic, sick man literally wasting away and consciously chose to let him suffer with the risk of imminent death. The jury quite reasonably must have rejected the notion that it would take someone with medical training to recognize that Cecil was dying and that, if that person failed to act, Cecil would die soon.

But there was other abundant evidence that defendant was consciously aware that his failure to act was endangering Cecil's life. He told his mother Cecil would barely eat. He told his sister that Cecil was just an old man dying. He admitted that he had not taken Cecil to the doctor for several years and did not fill his prescriptions, despite the fact he knew Cecil suffered from high blood pressure.

The jury also heard the testimony that although his mother transferred $2,500 from Cecil's trust into defendant's account every month, very little was spent on Cecil. Few clothes were found in Cecil's room, although defendant received $600 a month to buy him clothes. Nor did he use the monthly allocation for medicine to buy Cecil the medication he needed. Yet he was quite diligent in contacting the bank after Cecil's demise to obtain his inheritance from the quarter of a million dollars remaining in the trust.

Caretaking of the old and frail can be a Herculean task to be sure. But here there were adequate trust funds available to finance the care Cecil required. The jury justifiably concluded that a caretaker who did not use the resources available but allowed a disabled human being, however difficult he might have been, to lie in his own feces and

6

to literally waste away with flies buzzing around him was consciously and maliciously aware that his failure to get help, get medical attention, and/or to remove him from that environment endangered his life. There is more than substantial evidence to support the jury's conclusion that defendant committed second degree murder.

**Sufficiency of the Evidence to Support Embezzlement**

The jury also found defendant guilty of embezzlement of the property of an elder by a caretaker. (Pen. Code, § 368, subd. (e).) The jurors had been instructed: "To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed embezzlement;

"2. The property taken was that of an elder/a dependent adult;

"3. The property, goods, or services obtained was worth more than $950;

"AND

"4. The defendant was a caretaker of the elder/dependent adult." (CALCRIM No. 1807.)

Defendant does not dispute the sufficiency of the evidence that he was Cecil's caretaker, or that property worth more than $950 was taken from an elder/dependent adult. Using his mother, however, as the scapegoat, he argues he could not be found guilty of embezzlement because Wells Fargo entrusted Cecil's property to his mother, Cecil's conservator, and not to him. The jury was instructed on the crime of embezzlement as follows: "To prove that the defendant is guilty of theft by embezzlement, the People must prove that:

"1. An owner or the owner's agent entrusted his property to the defendant;

"2. The owner or owner's agent did so because he trusted the defendant;

"3. The defendant fraudulently used that property for his own benefit;

"AND

"4. When the defendant used the property, he intended to deprive the owner of its use." (CALCRIM No. 1806.)

7

It is true, as defendant suggests, the trust funds were paid directly to Darlene as Cecil's conservator. But there is abundant evidence that defendant had assumed responsibility for Cecil's care and Darlene remained the conservator in name only. Most significantly, the uncontroverted evidence is that Wells Fargo knew defendant had prepared the annual budgets, knew defendant had requested additional funds for medical expenses, and knew defendant was receiving the monthly disbursements for Cecil's care, albeit through Darlene.

Darlene testified defendant always prepared the budgets and called the bank so "[t]he bank always knew Jimmy was doing the budget." According to Darlene, the bank knew defendant was caring for Cecil.

In August 2009 defendant wrote to Wells Fargo requesting $151 for medications and $62 for doctor visits. He explained that he did all of Cecil's "food and other shopping and all meal preparation." Writing that he was available "24/7" to answer questions, he provided the bank his cell phone number. After August 2009 Darlene increased the monthly transfers she made to defendant from $1,720 to $2,500.

The issue is not whether defendant was Cecil's legal conservator, but whether the bank, as Cecil's agent, entrusted money to defendant on Cecil's behalf. We agree with the Attorney General that the jury could have inferred that because Wells Fargo knew defendant was caring for Cecil, prepared the budgets, had requested additional funds for Cecil's medical care, and that defendant ultimately received the money from the trust each month, it entrusted the money to defendant believing he would use it to provide for Cecil's basic needs, including medical care and medications. Thus, there is substantial evidence to support the jury's finding that defendant had defrauded the bank and, in doing so, had embezzled the money from Cecil.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts he was denied his constitutionally protected right to the effective assistance of counsel in violation of *Miranda v. Arizona* (1966) 384 U.S. 436

8

[86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*) and *Edwards v. Arizona* (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (*Edwards*) because his lawyer failed to suppress the incriminating statements he made to detectives the night Cecil was taken to the hospital. To prevail on his ineffective assistance of counsel claim, he must show that his lawyer's performance fell below an objective standard of reasonableness under prevailing professional norms and there is a reasonable probability that, but for counsel's subpar performance, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 [104 S.Ct. 2052, 80 L.Ed.2d 674].) Thus, he must demonstrate there is a reasonable probability a suppression motion would have been granted. We begin with the interrogation.

A sheriff's deputy spoke to defendant after emergency personnel arrived at his trailer. Defendant explained he had been caring for Cecil for three or four years, and Cecil had been bedridden for a month or month and a half. He described the basic care he provided Cecil and allowed the deputy to videotape the inside of his trailer before announcing that "he didn't trust them, and that he should talk to a lawyer."

Detective Dean Nyland unsuccessfully attempted to interview Cecil at the hospital before arriving at the trailer to question defendant. Lieutenant Carter Vaughn joined in the interrogation. Vaughn acknowledged that defendant had asked to speak to a lawyer but said it was up to him if he wanted to provide a statement. Defendant explained that he had already told the officers what happened. Vaughn told him that he and Nyland needed to hear it directly from defendant. Nyland then read him his *Miranda* rights and verified that defendant understood his right to retain counsel and to obtain the assistance of counsel. Defendant responded, "I'll tell you what happened tonight."

Yet defendant remained nervous. He told Nyland he was scared and wanted the advice of an attorney. But then he reiterated, "I'll tell you what happened tonight so you can clearly understand." He expressed his concern that he was going to be arrested no matter what he said. Nyland stated that he needed to know what happened. Again

9

defendant assured him, "I understand that and I'm gonna tell you that" and said he was not being a "smart ass." Defendant then explained how Cecil slumped over and became unresponsive and how he tried to revive him. Referring to him as "a retarded old man," defendant stated that Cecil had stopped taking medication for his high blood pressure; he was going blind and fell frequently; he wore diapers, which defendant changed frequently; and he needed to be fed.

Defendant refused to sign a written consent to search the trailer. At the end of the interview, he again expressed that he was nervous and stated, "I don't know what I'm supposed to do. I really need the advice of an attorney." He told the officers they could go into the trailer and look around but he did not feel comfortable signing anything. On appeal, he complains his lawyer failed to move to suppress the statements he made following the expression of his desire to seek the advice of an attorney.

To prevail on a motion to suppress the statements, his lawyer needed to demonstrate that defendant was in custody and that he made an unequivocal invocation of his right to counsel. (*Edwards*, *supra*, 451 U.S. 477.) A suspect cannot invoke his *Miranda* rights anticipatorily in a context other than custodial interrogation. (*Bobby v. Dixon* (2011) ___ U.S. ___ [132 S.Ct. 26, 29, 181 L.Ed.2d 328, 332]. Thus, we must make the objective assessment as to whether defendant was in custody and whether he actually invoked the right to counsel. (*Davis v. United States* (1994) 512 U.S. 452, 458 [114 S.Ct. 2350, 129 L.Ed.2d 362].) "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, . . . precedents do not require the cessation of questioning." (*Id.* at p. 459.) "If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (*Ibid*.)

Defendant was interrogated twice: once soon after emergency personnel arrived and later that evening by a different detective and a lieutenant. He made equivocal

10

references to an attorney during both interrogations. We point out, however, that he was not in custody during the first interview. A deputy approached defendant while he was sitting outside his trailer "just to find out what was going on." There is no evidence defendant was handcuffed or otherwise restrained or that he was told he was under arrest. To the contrary, he refused an invitation to accompany the deputies to the police department.

*People v. Nguyen* (2005) 132 Cal.App.4th 350 (*Nguyen*) presents a similar scenario. A suspect attempted to call her lawyer during a traffic stop. (*Id*. at p. 353.) The Court of Appeal held that the defendant's phone call did not preclude the police from later interrogating her at the police station. The court wrote: "To conclude defendant asserted her *Miranda* right to counsel before the officer had completed the arrest or sought to question her would permit invocation of *Miranda* rights 'anticipatorily . . . .' " (*Nguyen*, at p. 356.)

Similarly, defendant was not in custody when he told the deputy "he didn't trust them, and that he should talk to a lawyer." (*Nguyen*, *supra*, 132 Cal.App.4th at p. 356.) He therefore could not invoke any *Miranda* rights that might arise in the future. As a practical consequence, his cautionary statement that he should talk to a lawyer, made when he was not in custody, did not preclude questioning by the detective and the lieutenant when they arrived at the scene a couple of hours later to interrogate him.

As recounted above, the detective informed defendant of his rights to remain silent and to seek the advice of counsel. Defendant contends that he did just that—he invoked his right to a lawyer and all further questioning should have ceased immediately. We disagree and conclude he never clearly and unequivocally invoked his right to counsel. To the contrary, despite his nervousness and his allusions to an attorney, defendant objectively demonstrated a willingness to tell the officers what had happened. The officers gave him several opportunities to stop talking and assured him of his right to counsel. Nevertheless, defendant continued to explain on his own, not in response to

11

questioning, how he had cared for Cecil and what had transpired before Cecil became unresponsive. In the absence of an unequivocal invocation of the right to counsel, the officers were not compelled to stop the interrogation.

We conclude the motion to suppress would not have been successful and defense counsel was not obliged to bring a meritless motion. Defendant's ineffective assistance of counsel claim therefore is equally without merit.

### III. CLERICAL ERRORS

The Attorney General agrees with defendant's assertion that there are clerical errors in the abstract of judgment. The superior court is directed to amend the abstract of judgment to reflect that counts 1 and 2 were committed in 2012, and count 3 was committed between 2009 and 2010. The abstract must also be amended to indicate that defendant's conduct credits were calculated under Penal Code section 2933.1.

### DISPOSITION

The superior court is directed to correct the abstract of judgment as discussed herein. In all other respects, the judgment is affirmed.


                                                    RAYE            , P. J.

We concur:



        BLEASE         , J.



        DUARTE         , J.


12