J-S29028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMEL MONTGOMERY | : | |
| | : | |
| Appellant | : | No. 1287 EDA 2019 |

Appeal from the Order Entered April 26, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005837-2008

BEFORE:    PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY NICHOLS, J.:                                    **FILED JUNE 25, 2021**

Appellant Jamel Montgomery appeals from the order denying his timely first Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, petition without a hearing.  Appellant contends that the PCRA court erred in rejecting his numerous claims of ineffective assistance of counsel based on the suppression of his confession, as well as his trial counsel's failure to (1) request or object to jury instructions, (2) challenge the weight of the evidence, (3) object to the closure of the courtroom during *voir dire*, and (4) consult with him before trial.  This panel granted reconsideration based on Appellant's application for reargument concerning his ineffectiveness claim related to the suppression of his confession.  Following reconsideration, we affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

This Court previously summarized the facts of Appellant's convictions as follows:

The [decedent], Derrell Windley, was pronounced dead on February 5, 2006, and the cause of death was multiple gunshot wounds as a result of a homicide. The decedent was shot in the left wrist, left hip, left lower back, left lower buttocks and left leg. [S]everal bullets were recovered from the body of [the decedent].

Janell Windley, the decedent's wife, stated that [the decedent] had dropped her off at work at the airport at 5:00 a.m. on February 5, 2006. Around 1:30 p.m. that same day, Mrs. Windley spoke with the decedent who stated that he was at the Dollar Store purchasing dish detergent. . . .

Officer John Taggart of the Crime Scene Unit testified on behalf of the Commonwealth. He documented the crime scene at 6362 Kingsessing Avenue on February 5, 2006 at 5:34 p.m. On the sidewalk in front of the residence, there were two red stained t-shirts and a black baseball cap. On the steps leading up to the residence there were small Ziploc red plastic bags with a white substance inside of them. Fire Cartridge casings, bullets, and bullet fragments were found on the porch of the residence. All items were placed under property receipt.

Lenea Burnett testified on behalf of the Commonwealth under a plea agreement. She was present when . . . Appellant shot the decedent and she identified the Appellant in court as the perpetrator of the crime. Ms. Burnett had known the Appellant whom she referred to as "Cheese Ball" for a few years prior to the incident.

On February 5, 2006, she was standing outside a store at the corner of 64th and Kingsessing Streets and took a piece of paper from the decedent that contained his name, phone number, and indicated that he sold marijuana. Ms. Burnett then went back to her house on Kingsessing between 63rd and & 64th streets where the Appellant was present along with "Lester, Shannon, Selena and someone named April." She showed the piece of paper to the other individuals and they began a plan to rob the decedent. Ms. Burnett stated that "Shannon said that I will buy the weed . . . Cheese Ball would get the money back and weed from him and he would rob him afterwards." The plan was then that the marijuana would be split between everybody in the house and the money

- 2 -

was going to be split between Shannon and the Appellant. The money was going to be used to pay for an abortion.

Selena Baldwin then contacted the decedent on her cell phone and Ms. Burnett arranged to meet the decedent at the corner. The decedent informed Ms. Burnett that he would not sell her drugs outside during the daytime. Ms. Burnett then went back to her house and saw Appellant on the porch and explained to him that the decedent would not sell her drugs. Shannon then told Ms. Burnett that she should meet the decedent across the street at 6326 Kingsessing. Ms. Burnett then went back to the corner and told the decedent to come with her inside of 6326 Kingsessing. After she asked the decedent if he had the marijuana, he began to talk to her for approximately a minute before Appellant came out of the dining room area and stated that he had a gun. Appellant then shot at the decedent and Ms. Burnett ran up the stairs and then ran back down the stairs and out the back door as she heard the second shot from Appellant's firearm. She never saw a firearm on the decedent.

Ms. Burnett kicked the back door into her home and looked out of the front door along with Shannon, Selena, April and Lester. A few minutes later, Ms. Burnett saw the Appellant and asked him why he shot the decedent. Appellant responded that the decedent had a gun. Ms. Burnett responded that decedent did not have a firearm. Appellant then indicated that he had hid[den] his gun by the train tracks in the back of 6362 Kingsessing Street. [Ms. Burnett] came in contact with the police on November 8, 2007 at her new residence on Sheldon Street and gave a signed and sworn statement to the homicide detectives.

Officer John Cannon of the Firearms Identification Unit testified that all the bullet and bullet fragments found at the scene were fired from the same gun. Furthermore, the four bullets found within the decedent were also fired from that same gun.

Detective Grady Patterson testified that on February 5, 2006, he examined a cell phone recovered at the scene from the decedent. The last phone call made at 3:02 p.m. was to [a telephone belonging to Selena Baldwin]. . . . [B]ased on . . . information obtained from [Selena Baldwin's cousin, Charmaine Baldwin], the police began to look for individuals identified as "Nene" and "Ball." After several unsuccessful months attempting to identify and locate these individuals, the case was transferred to the Special Investigation Unit.

Detective Brian Peters testified that he began investigating the case as part of the "cold case" squad and was able to locate "Nene" who was identified as Lenea Burnett, . . . through a welfare application. After interviewing Ms. Burnett, Detective Peters prepared an arrest warrant for Appellant. Detective Peters also testified that Selena Baldwin was arrested and [was] awaiting trial in this matter.

On November 12, 2007, Detective Peters interviewed the Appellant in police custody. Appellant corroborated Ms. Burnett's testimony but stated that he saw a gun on the decedent and got scared and shot the decedent. Appellant then stated that one of the decedent's friends came and grabbed the gun from the decedent after he was murdered. Appellant stated that he gave his gun to Ms. Burnett after the shooting and she returned it to him and he gave it to a "hustler" on 61st and Upland Streets.

*Commonwealth v. Montgomery*, 3210 EDA 2011, 2013 WL 11267070, at *1-2 (Pa. Super. filed Apr. 10, 2013) (unpublished mem.) (citation omitted).

A jury found Appellant guilty of second-degree murder, robbery, and possessing an instrument of crime. On October 20, 2009, the trial court sentenced Appellant to an aggregate term of life imprisonment.

Following the reinstatement of Appellant's direct appeal rights in a prior PCRA proceeding, this Court affirmed the judgment of sentence. *See id.* Our Supreme Court denied Appellant's petition for allowance of appeal on November 6, 2013. *Commonwealth v. Montgomery*, 220 EAL 2013 (Pa. filed Nov. 6, 2013).

Appellant timely filed a *pro se* PCRA petition received on August 19, 2014. Appointed PCRA counsel filed an amended petition on September 22, 2017. The Commonwealth filed a motion to dismiss on October 5, 2018. The

PCRA court issued a Pa.R.Crim.P. 907 notice on March 7, 2019, and dismissed Appellant's PCRA petition April 26, 2019.

Appellant timely filed a notice of appeal. Appellant's appointed PCRA counsel filed a Pa.R.A.P. 1925(b) statement one day late, which the PCRA regarded as timely filed. The PCRA court filed a Rule 1925(a) opinion. This Court issued a memorandum decision affirming the PCRA court's ruling. Appellant timely filed an application for reargument, and this panel granted reconsideration on March 22, 2021. Order, 3/22/21.

Appellant presents the following issues, which we have reordered for review:

> [1.] Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel failed to move to suppress Appellant's inculpatory statement under **Missouri v. Seibert**, 542 U.S. 600, 604 (2004) [(plurality)] after the evidence showed that police first interrogated Appellant without **Miranda**[1] warnings, thereby tainting the statement that police obtained after providing **Miranda** warnings.[2]
>
> [2]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel was ineffective in failing to object to the trial court's jury instruction as it related to the voluntariness of Appellant's confession.
>
> [3]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[2] As noted above, Appellant's application for reargument focused on this first issue. We have not altered the substance of our discussion of Appellant's remaining six issues.

trial counsel was ineffective in failing to request a cautionary instruction regarding Appellant's pre-trial arrest and incarceration.

[4]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel was ineffective in failing to raise the defenses of justification and voluntary manslaughter given that those defenses were supported by the record.

[5]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel was ineffective in failing to file a post-sentence motion for a new trial based on the weight of the evidence.

[6]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel was ineffective in failing to meet with Appellant more than three days prior to trial because Appellant had only three days to look at the discovery for his case, thereby effectively denying him the right to participate in his own defense.

[7]. Whether the [PCRA] court erred in denying Appellant's amended [PCRA] petition without an evidentiary hearing where trial counsel and appellate counsel were ineffective in failing to object to the trial court's refusal to allow Appellant's family to attend *voir dire* in violation of Appellant's right to a public trial under the Pennsylvania and United States Constitutions and in failing to raise that issue on appeal.

Appellant's Brief at viii-x (some formatting altered).[3]

_____

[3] Appellant was initially represented by James Bruno, Esq. at his preliminary hearing. In June 2008, Michael Coard, Esq., entered his appearance on Appellant's behalf, but was permitted to withdraw in August 2008. Attorney Bruno was appointed as counsel in September 2008. It appears that because the Commonwealth initially brought a capital case against Appellant, James Lammendola, Esq., was listed as mitigation counsel. By December 2008, Appellant's case was no longer listed as a capital case and Attorney Bruno remained listed as Appellant's pre-trial, trial, and post-sentence counsel. Appellant notes that Attorney Bruno was suspended from the practice of law effective February 2013. Appellant's Brief at xiv.

*(Footnote Continued Next Page)*

The following standards govern our review from the dismissal of a timely PCRA petition:

> [A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error. The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level.
>
> To establish trial counsel's ineffectiveness, a petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for the course of action or inaction chosen; and (3) counsel's action or inaction prejudiced the petitioner.

Furthermore,

> [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him.

*Commonwealth v. Freeland*, 106 A.3d 768, 775 (Pa. Super. 2014) (citations omitted). "[A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's

_____

John Cotter, Esq., represented Appellant in the reinstatement of Appellant's direct appeal rights and continued as Appellant's direct appeal counsel.

Henry Sias, Esq., represented Appellant as PCRA counsel, filed the amended PCRA petition, and perfected the instant appeal. Zak T. Goldstein, Esq., currently represents Appellant in this appeal.

ineffectiveness was of such magnitude that it 'could have reasonably had an adverse effect on the outcome of the proceedings.'" *Id.* at 776 (citations omitted).

**Appellant's First Issue Concerning Counsel's Ineffectiveness in the Motion to Suppress Appellant's Confession**

As noted above, Appellant gave police an inculpatory statement indicating that (1) he helped to plan and carry out the robbery and (2) he shot the decedent because he believed that the decedent was armed and was raising a firearm at him. Appellant's trial counsel subsequently filed a pre-trial motion to suppress Appellant's statement.

The record additionally reveals the following. At the time Detective Peters received information on the killing of the decedent and sought to interview Appellant, Appellant was in custody at the Curran-Fromhold Correctional Facility (CFCF) on charges of possession with intent to deliver a controlled substance. N.T., 10/19/09, at 39. On the morning of November 12, 2007, Detective James McLaughlin faxed paperwork to CFCF to pick up Appellant at 12:00 p.m.[4] N.T., 10/13/09, at 134. Detective McLaughlin and another detective picked up Appellant at CFCF sometime after 12:00 p.m. and transported him back to the police station at 8th and Race Streets. *Id.* at 135. Detective McLaughlin placed Appellant in a locked interview room

---

[4] Detective McLaughlin testified that he faxed the paperwork to the prison at 10:03 a.m., although the Commonwealth's exhibit at the suppression hearing indicated that the fax was stamped 12:03 a.m. N.T., 10/13/09, at 142.

between 1:00 and 1:30 p.m. *Id.* Appellant was in handcuffs throughout the transport from CFCF to the police station. *Id.* Detective McLaughlin testified that he did not discuss the instant case or attempt to interrogate Appellant during the transport or after placing him in the interview room. *Id.* at 136-37.

Detective Peters testified that he started the interrogation of Appellant in the instant case shortly after 4:00 p.m. that same day.[5] According to Detective Peters, Appellant was "by himself" and "not restrained in any way" when the detective "came into contact with him" in the interview room. *Id.* at 145.

Of particular relevance to this appeal, Detective Peters testified that he did not give Appellant *Miranda* warnings when he first spoke to Appellant about the killing of the decedent. *Id.* at 146. Neither the Commonwealth nor trial counsel questioned Detective Peters regarding his intention in not giving Appellant *Miranda* warnings.

Detective Peters offered the following testimony concerning when he issued *Miranda* warnings. Initially, Detective Peters indicated that Appellant "was denying his involvement in the case[ d]uring our initial conversation" and that Appellant's "oral warnings were given **after** he had told us what happened." *Id.* at 147-48 (emphasis added)

_____

[5] Detective Peters testified that he was at a training session when Detective McLaughlin transported Appellant to the police station. N.T., 10/13/09, at 145.

Upon further questioning by the Commonwealth, Detective Peters testified as follows:

> [Detective Peters]. [Appellant] tells me what happened, he tells me his version of what happens. That's when he's Mirandized orally and subsequently a formal statement was taken from him.
>
> [The Commonwealth]. Could you describe exactly how that went? What did he say, and then what led you to give him any *Miranda* Warnings.
>
> [Detective Peters]. He told us, I'm going to tell you what happened. He wants to tell me his side. Because [Appellant] wanted to make sure that it was not just [him] involved in this.
>
> [The Commonwealth]. Just so I'm clear. Once you initially related to him what your investigation had revealed, he indicates he wants to tell what happened. Was it was at that point that you gave the *Miranda* [w]arning?
>
> [Detective Peters]. Yes.
>
> [The Commonwealth]. After giving the oral *Miranda* [w]arning, how long did you talk to him for?
>
> [Detective Peters]. It wasn't much longer after that. Because [Appellant] was cooperative at that point. And then it was right after that we set up and took the formal interview.

*Id.* at 148-49. The transcript of the formal interview indicated that Appellant signed a page containing the *Miranda* warnings at approximately 6:15 p.m. *Id.* at 150-51, 155, 163. On cross-examination, Detective Peters confirmed that while Appellant signed a waiver of his *Miranda* warnings at 6:15 p.m., the detective previously gave "oral" *Miranda* warnings "when [Appellant] began to tell me what happened." *Id.* at 163.

The record also indicates that Appellant's trial counsel sought suppression of Appellant's confession, arguing, in part, that:

- 10 -

> Once [Appellant is] actually in police custody he should have been given his warnings. And what happens is, after he talks to police, after he changes his testimony or his statement around is that something that starts to incriminate is when the police actually started to give him his warnings.
>
> At that point, the cat's out of the bag, he doesn't really have an opportunity then to withdraw that because they already heard him explaining his participation in something.
>
> So I would submit . . . that they should have given him his warnings at the time he was originally arrested and as soon as he got into the police station. That's the first thing.

*Id.* at 170-71.[6]

The trial court made findings of fact and conclusions of law on the record after hearing the testimony and arguments. As to Appellant's claim that Detective Peters should have administered ***Miranda*** warnings as soon as Appellant was in custody and interrogated for the killing of the decedent, the trial court determined:

> The . . . issue becomes the two statements. One, the oral statement. In this case once Detective Peters indicated that he shared the information that his investigation had determined and once it became apparent that [Appellant] was willing to talk about his version that he was given the ***Miranda*** warnings. And the discussion continued from there. In any event, well, the [c]ourt finds no unduly coercive circumstances to be evident in that situation. But the statement sought to be suppressed is actually

---

[6] In his second point, Appellant's trial counsel argued that the Commonwealth violated the former "six-hour rule." ***See*** N.T., 10/13/09, at 171. We note that in ***Commonwealth v. Perez***, 845 A.2d 779, 787 (Pa. 2004), our Supreme Court abrogated the bright line application of the six-hour rule between the time of arrest and arraignment. ***See Commonwealth v. Yandamuri***, 159 A.3d 503, 529 (Pa. 2017). Nevertheless, the time "between arrest and arraignment remains a factor to consider in the voluntariness analysis." ***Id.*** (citing ***Perez***, 845 A.2d at 787).

the written statement, which there is full evidence of *Miranda* having been given and [Appellant] signed statement.

*Id.* at 175-76. The trial court later added that "once Appellant indicated that he wanted to give a statement, he was then promptly advised of his *Miranda* rights." Trial Ct. Op., 5/30/12, at 7.

In rejecting Appellant's claim that his trial counsel was ineffective with respect to the suppression motion, the PCRA court determined:

[Appellant] states that counsel was ineffective in not seeking suppression under the Supreme Court ruling in [*Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality)]. However, [*Seibert*] was not applicable in this situation because, the police officer in this instance, was already questioning [Appellant] with regards to a different matter. It was on record that he was mirandized and elected to speak on the matter. The counsel in this case sought to suppress through a different matter and was unsuccessful.

Again, this resounds with the question of strategy, there was a reasonable basis that counsel did not follow through using [*Seibert*]—it was inapplicable to this situation.

PCRA Ct. Op., 8/14/19, at 6.

Appellant, in his first issue in this appeal, maintains that trial counsel was ineffective for failing to seek suppression of his confession based on *Seibert*. Appellant's Brief at 9, 16. Appellant recognizes that *Seibert* was a plurality decision, which this Court held does not have precedential value. *Id.* at 12-13. Nevertheless, Appellant asserts that federal courts have subsequently recognized that Justice Kennedy's concurring opinion in *Seibert* announced a binding rule of law that forbids police from deliberately

- 12 -

withholding ***Miranda*** warnings before interrogating a suspect. ***Id.*** at 13-15. Appellant contends:

> [I]t is clear that police may not engage in a question-first strategy designed to elicit a quick confession and then fix the ***Miranda*** violation by subsequently administering warnings and asking the suspect to confess again. In order for the second, warned statement to be admissible, the Commonwealth must show that things have changed—that the two interrogations are separate and that there has been a break in the chain.

***Id.*** at 15-16.

Appellant continues that Detective Peters' administration of ***Miranda*** warnings **after** starting his interrogation of Appellant was unconstitutional. ***See id.*** at 17. Appellant, therefore, asserts that Detective Peters used an "illegal two-step process to trick [Appellant] into providing a confession," which ***Seibert*** expressly forbids. ***Id.*** at 17. Additionally, Appellant asserts that Pennsylvania case law should be overruled because it conflicts ***Seibert***. ***See*** Appellant's Application for Reargument, at 3.

The Commonwealth responds that Appellant's ineffectiveness claim lacked merit. Commonwealth's Brief at 14-16. The Commonwealth also asserts that Appellant "acknowledged that [his trial] counsel had a reasonable approach when litigating" a motion to suppress Appellant's confession. ***Id.*** at 14.

Our consideration of whether Appellant's ineffectiveness claim has arguable merit first requires a review of the applications of the ***Miranda*** rule set forth in ***Oregon v. Elstad***, 470 U.S. 298 (1985) and ***Seibert***. In ***Elstad***,

- 13 -

the defendant was arrested at his home and gave incriminating statements in response to police questioning without *Miranda* warnings. *Elstad*, 470 U.S. at 300-01. After police transported the defendant to the station, officers administered *Miranda* warnings, and the defendant signed a written confession. *Id.* at 301-02. Following his conviction and appeal, the Oregon Court of Appeals concluded that police unlawfully obtained the defendant's written confession. *Id.* at 303. The state court noted, "[r]egardless of the absence of actual compulsion, the coercive impact of the unconstitutionally obtained statement [at the time of the defendant's arrest] remain[ed]," and tainted the defendant's subsequent written confession even after *Miranda* warnings were given. *Id.* (citations and quotation marks omitted).

The United States Supreme Court, in *Elstad*, reversed the state court, explaining:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309. The Court continued:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an

> unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314.

In *Seibert*, the defendant orchestrated a plan to conceal the death of one of her children by burning her family's mobile home with another person inside the home. *Seibert*, 542 U.S. at 604. One of the defendant's sons started the fire, resulting in the burning of her deceased child's body, the death of the other person, and injuries to the son who started the fire. *Id.* Police arrested the defendant at her son's hospital room and the arresting officer followed instruction from other officers to not give *Miranda* warnings. *Id.* At the station, another officer interrogated the defendant without giving *Miranda* warnings, and the defendant, after approximately forty minutes, admitted she knew that the other person would die in the fire. *Id.* at 604-05. After a twenty-minute break, the officer began taping the interrogation, gave *Miranda* warnings, which the defendant waived, and then confronted her with her pre-warning statements. *Id.* at 605. The defendant admitted that the other person was supposed to die in the fire while sleeping. *Id.*

At a suppression hearing, the interrogating officer admitting that he made a "'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique [that] he had been taught: question first, then give

the warnings, and then repeat the question 'until [he got] the answer that [the defendant] already provided once.'"  **Id.** at 605-06.  Following the defendant's conviction and appeal, the Missouri Supreme Court concluded that the defendant's second statement should have been suppressed.  **Id.** at 606. The United States Supreme Court granted certiorari "to resolve a split" in the courts regarding the deliberate withholding of **Miranda** rights.  **Id.** at 607.

Justice Souter announced the judgment of Supreme Court in an opinion that Justices Stevens, Ginsburg and Breyer joined.  In the plurality opinion, the Court reasoned:

> The contrast between **Elstad** and this case reveals a series of relevant facts that bear on whether **Miranda** warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.  In **Elstad**, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the **Miranda** warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.
>
> At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the **Miranda** warnings.  The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.  When the same officer who had conducted

the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything [the defendant] said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the interrogating officer] set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.* at 615-17 (record citation and footnotes omitted). The *Seibert* plurality, therefore, affirmed the suppression of the defendant's second statement concluding that the "midstream" *Miranda* warnings were inadequate.

Justice Kennedy, who provided the fifth vote in support of affirming the state court's decision to suppress the defendant's second statement, wrote a separate concurrence.[7] Justice Kennedy observed that the plurality's set forth a multifactor test designed to assess whether *Miranda* warnings were

---

[7] Justice O'Connor authored the dissent, in which Chief Justice Rehnquist, Scalia, and Thomas joined. *Seibert*, 542 U.S. at 622. The dissent concluded that *Elstad* required vacating the state court's decision that the defendant's second statement be suppressed. *Id.* at 622-23 (O'Connor, J., dissenting).

- 17 -

effective based on an objective inquiry from the perspective of the suspect.

*Id.* at 621 (Kennedy, J., concurring). According to Justice Kennedy:

> [T]his test cuts too broadly. *Miranda*'s clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.
>
> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.

*Id.* at 622 (Kennedy, J., concurring) (citations omitted). In describing possible curative measures, Justice Kennedy noted that a sufficient break in time and circumstances between prewarning statements and the giving of *Miranda* warnings could suffice or that "an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Id.* (Kennedy, J., concurring).

Following *Seibert*, and approximately four years before the Appellant's interrogation in this matter, the United States Third Circuit Court of Appeals adopted Justice Kennedy's concurrence as precedential in 2005. *See United States v. Naranjo*, 426 F.3d 221, 231-32 (3d Cir. 2005) (discussing *Marks v. United States*, 430 U.S. 188, 193 (1977), for the proposition that "[w]hen

a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the 'holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds'"). At present, it appears that the majority of the federal circuit courts that have considered the question have held that Justice Kennedy's concurrence provides a "controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream **Miranda** warnings." **United States v. Guillen**, 995 F.3d 1095, 1115-16 (10th Cir. 2021) (collecting cases).[8] However, despite the growing consensus, not all circuits agree. **See id.** at 1117 (discussing **United States v. Ray**, 803 F.3d 244 (6th Cir. 2015); **United States v. Heron**, 564 F.3d 879 (7th Cir. 2009)).

However, Pennsylvania courts did not directly address **Seibert** in a published opinion until 2011, approximately two years after Appellant's suppression hearing and subsequent conviction, but before his direct appeal *nunc pro tunc*.[9] Specifically, in **Commonwealth v. Charleston**, 16 A.3d 505 (Pa. Super. 2011), *abrogated on other grounds by* **In re L.J.**, 79 A.3d 1073 (Pa. 2013), this Court concluded that "**Seibert** establishes no new binding

---

[8] Before **Guillen**, the United States Tenth Circuit of Appeal appeared to have held that Justice Kennedy's concurrence in **Seibert** was not precedential.

[9] In 2007, our Supreme Court briefly discussed **Seibert** in **Commonwealth v. Eichinger**, 915 A.2d 1122, 1131 (Pa. 2007), but found it inapt to the defendant's claim because the defendant was not in custody when she gave a prior unmirandized statement. **Eichinger**, 915 A.2d at 1135.

precedent." ***Charleston***, 16 A.3d at 525. The ***Charleston*** Court's rationale relied on a discussion in dissent in a federal case that was subsequently cited with approval by other federal decisions such as ***Heron***. ***See id.*** at 524-26.

With this background in mind, we conclude that Appellant has failed to establish arguable merit to his claim. First, we note that none of the cases cited by Appellant support the proposition that ***Seibert*** should be read to hold that the deliberate withholding of ***Miranda*** warnings alone constitutes a constitutional violation requiring suppression of a confession. In ***Bobby v. Dixon***, 565 U.S. 23 (2011), for example, the United States Supreme Court noted:

> In ***Seibert***, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." But in this case [the defendant] steadfastly maintained during his first, unwarned interrogation that he had "[n]othing whatsoever" to do with [the victim's] disappearance. Thus, unlike in ***Seibert***, there is no concern here that police gave [the defendant] ***Miranda*** warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, [the defendant] **contradicted** his prior unwarned statements when he confessed to [the victim's] murder.

***Bobby***, 565 U.S. at 31 (citations omitted).

Similarly, our Supreme Court described ***Seibert*** as involving "a particular interrogation method . . . where police officers intentionally refrained from advising the accused of his ***Miranda*** rights **until after they elicited a confession**." ***Commonwealth v. Busanet***, 54 A.3d 35, 58 (Pa. 2012) (emphasis added). Therefore, our review concludes that the United

States Supreme Court and our Supreme Court have required that police first obtain an unwarned confession in order for **Seibert** to apply. **See Dixon**, 565 U.S. at 31; **Busanet**, 54 A.3d at 58.

Here, there was conflicting testimony regarding when Detective Peters advised Appellant of his **Miranda** rights. However, the trial court found that Detective Peters did so **before** Appellant made incriminatory statements. **See** N.T., 10/13/09, at 175-76; Trial Ct. Op., 5/30/12, at 7. Although Appellant insists he made an inculpatory statement before the Detective gave **Miranda** warnings, this Court is bound by the trial court's findings that have support in the record. **See Commonwealth v. Miller**, 56 A.3d 1276, 1279 (Pa. Super. 2012). Accordingly, Appellant's reliance on **Seibert** is misplaced. **See Dixon**, 565 U.S. at 31; **Busanet**, 54 A.3d at 58.

In any event, even if **Seibert** applies when the police do not obtain a prewarning inculpatory statement, the status of **Seibert** remained in doubt in Pennsylvania at the time of Appellant's suppression hearing. By the time of Appellant's direct appeal, and despite the growing majority of decisions favoring the adoption of Justice Kennedy's concurring opinion, this Court has rejected similar **Seibert** arguments in **Charleston**. Similar to the principle that trial counsel cannot be held ineffective for failing to predict a change of law, it appears that counsel cannot be held ineffective for failing to predict what Appellant believes has become the holding of **Seibert** or that a decision of this Court may be overruled in the future. **Cf. Commonwealth v. Hannibal**, 156 A.3d 197, 231-32 (Pa. 2016). Simply put, by the time of

Appellant's direct appeal, there was clear precedent adverse to Appellant's present position, and we cannot hold counsel ineffective foregoing an argument that **Charleston** was wrongly decided. **Cf. id.**

For these reasons, we conclude that Appellant failed to establish arguable merit to his claim of ineffective assistance of counsel based on **Seibert**. Because Appellant has not demonstrated reversible error in the PCRA court's ruling, we find that no relief is due.

### Appellant's Second, Third and Fourth Issues Concerning Counsel's Ineffectiveness as to Jury Instructions

In his next three issues, Appellant contends that trial counsel was ineffective for failing to (a) object to the trial court's jury instruction regarding the voluntariness of his confession, (b) request a cautionary instruction regarding his incarceration on unrelated charges, and (c) request self-defense jury instructions.

When reviewing a trial court's jury instructions, the following principles govern:

> [O]ur scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error.

**Commonwealth v. Barker**, 963 A.2d 495, 507 (Pa. Super. 2008) (citation omitted).

Moreover,

we must review the jury charge as a whole to determine if it is fair and complete. A trial court has wide discretion in phrasing its jury instructions, and can choose its own words as long as the law is clearly, adequately, and accurately presented to the jury for its consideration. The trial court commits an abuse of discretion only when there is an inaccurate statement of the law.

*Id.* (citation omitted).

Our Supreme Court has stated that "[t]he Suggested Standard Jury Instructions themselves are not binding and do not alter the discretion afforded trial judges in crafting jury instructions; rather, "[a]s their title suggests, the instructions are guides only." *Commonwealth v. Simpson*, 66 A.3d 253, 274 n.24 (Pa. 2013).

### (a) Jury Instruction on the Voluntariness of Appellant's Confession

Appellant argues that his trial counsel was ineffective for failing to object to trial court's incomplete and misleading instruction. Appellant's Brief at 31. As to arguable merit, Appellant contends that the trial court failed to instruct the jury in line with Pennsylvania Suggested Standard Criminal Jury Instruction 3.04D, entitled "Proof; *Miranda*," and an alternative to 3.04C, entitled "Proof, Totality of the Circumstances." *Id.* at 32. Appellant further asserts that trial counsel lacked a reasonable basis because the delay in giving Appellant his *Miranda* warnings and the delay in bringing Appellant to arraignment were issues relevant to the jury's consideration of the voluntariness of his confession. *Id.* at 33-34. Lastly, Appellant contends that

the outcome of the trial would have been different based on a finding that Appellant's confession was involuntary. *Id.* at 34.

The Commonwealth responds that Appellant's ineffectiveness claim fails because "[t]here was no basis for counsel to" object to the trial court's instruction. Commonwealth's Brief at 22. According to the Commonwealth, the trial court "accurately instructed the jury on the *Miranda* issue in order to properly guide its deliberations." *Id.* at 23 (record citation omitted). The Commonwealth further argues that Appellant failed to establish any basis for the trial court to instruct on an unnecessary delay of Appellant's arraignment. *Id.* at 24.

Initially, we note that Appellant fails to acknowledge the trial court's ruling that suggested jury instruction 3.04D would confuse the jury. Moreover, Appellant provides only a brief citation to Pa. SSJI (Crim) 3.04D without further discussion and argues prejudice in boilerplate fashion without any citation to the record. *See* Appellant's Brief at 32-33. Under these circumstances, we are constrained to find Appellant's arguments of trial counsel's effectiveness based on suggested jury instruction 3.04D waived. *See* Pa.R.A.P. 2119(a); *Commonwealth v. Kane*, 10 A.3d 327, 331-32 (Pa. Super. 2010).

As Appellant's claim is based on standard jury instruction 3.04C, we note that the Pennsylvania Suggested Standard Jury Instructions state, in relevant part:

3.04C DEFENDANT'S STATEMENT: VOLUNTARINESS—PROOF, TOTALITY OF CIRCUMSTANCES

1. In deciding whether the statement was voluntary, you should weigh all facts and circumstances surrounding the making of the statement that shed light on whether the statement was the product of [an essentially free will and choice and not of a will and choice overborne by pressure] [a rational mind and free will and not of a mind or will confused or burdened by improper influences].

*[First Alternative]*

2. The facts and circumstances to be considered include the duration and methods of police questioning, the length of delay between the defendant's arrest and arraignment before a magistrate, the conditions of the defendant's detention, the attitudes of the police toward the defendant, the defendant's physical and psychological state, and all other conditions present that might have drained the defendant's power to resist suggestion and undermined his or her power of self-determination.

[In determining voluntariness, you should consider [*items to consider*].]

[*Second Alternative*]

2. The facts and circumstances to be considered include the age, intelligence, personality, education, experience, and mental and physical state of the defendant, how the defendant was treated before, during, and after questioning, the time, place, and conditions under which the defendant was detained and questioned, the motives and attitudes of the police who questioned [him] [her] and what was said and done by the police, the defendant, and anyone else present during the questioning. [**You should consider any delay by the police in bringing the defendant before a magistrate for arraignment and whether the delay was unnecessary.**]

[In determining voluntariness you should consider [*items to consider*].]

Pa. SSJI (Crim) 3.04C(1)-(2) (emphasis added).

Instantly, the record establishes that the trial court, Appellant's trial counsel, and the Commonwealth discussed the jury instructions relating to Appellant's confession. *See* N.T., 10/19/09, at 22-24. The Commonwealth referred to suggested jury instruction 3.04D, but asked for an instruction that the court previously determined there was no *Miranda* violation. *Id.* at 22. Appellant's trial counsel initially stated, "That's not an issue," but then asserted, "That's the jury's decision. . . . *Miranda*, whether it's voluntary or not. That's something for the jury to determine. . . . I think it's appropriate to have that instruction in there." *Id.* at 22-23. However, the Commonwealth maintained its position that the jury should be informed of the trial court's ruling that Appellant's statement was "made in accordance with *Miranda*." *Id.* at 23-24.

Ultimately, the trial court concluded that the question of a *Miranda* violation was "not for the jury to determine" in light of its suppression ruling, and Appellant's trial counsel agreed. *Id.* at 24. The trial court ruled: "I'm not going to give this. I think it's confusing . . . 3.04[(D)] is out." *Id.* Appellant's trial counsel did not object. *Id.*

During its charge, the trial court gave the following jury instruction regarding the voluntariness of Appellant's confession:

> Before you may consider that statement as evidence against the defendant, you must find that a crime was in fact committed, that the defendant made the statement and that the statement was voluntary. Otherwise you must disregard the statement.

Each juror should ultimately decide these questions for himself or herself and thereby individually accept or reject the defendant's statement as evidence.

You must not allow the fact that I admitted the statement in evidence to influence you in any way during your deliberations.

I will now instruct you in more detail about the rules you must follow in dealing with that statement.

In deciding whether the statement was voluntary you should weigh all facts and circumstances surrounding the making of the statement that shed light on whether the statement was a product of a rational mind and free will and not of a mind or will confuse or burdened by improper influences. The facts and circumstances to consider include: Age, intelligence, personalty [sic], education, experience and mental and physical state of the defendant; how the defendant was treated before, during and after questioning; the time, place and conditions under which the defendant was detained and questioned; the motive and attitude of the police who questioned him, and what was said and done by the police; the defendant and anyone else present during th[e] questioning.

\* \* \*

[I]f a defendant makes a statement in response to police questioning, the basic test for determining its voluntariness is this. To be voluntary, a defendant's statement must be the produce of a rational mind and a free will. The defendant must have a mind capable of reasoning about whether to make a statement or say nothing, and he or she must be allowed to use it. The defendant must have sufficient will power to decide for himself or herself whether or not to make a statement and he or she must be allowed to make that decision.

This does not mean that a statement is involuntary because the defendant made a hasty or a poor choice. It might have been easier to say nothing. Nor does it mean that statement is involuntary merely because it was made in response to certain questions.

It does mean, however, that if a defendant's mind will/are confused or burdened by promises of advantage, threats, physical or psychological abuse or other improper influence any statement he or she makes is involuntary.

The reason that the law prohibits involuntary statements are grounded in our constitutions. Prohibition is based on a strong public policy that disapproves of the use by police of improper methods to extract involuntary confessions or admissions.

Furthermore, our system for enforcing the law should not operate in a way that takes advantage of persons who are in a physically or weakened condition to the point that they cannot give a knowing, intelligent and voluntary statement. Where voluntariness is an issue the prosecution has the burden of proving by a preponderance of the evidence that it is more likely than not that the statement was voluntary.

You should consider the totality of the circumstances and all the relevant evidence excluding the statement as to whether or not the defendant's statement was voluntary.

If you find that the defendant made a statement voluntarily, you may then consider the statement as evidence against him. You should consider the facts and circumstances surrounding the making of the statement along with all other evidence in the case. In judging its truthfulness and deciding how much weight, if any, the statement deserves on the question whether the defendant has been proven guilty.

N.T., 10/19/09, at 93-94, 96-98. Appellant's trial counsel again did not object.

Following our review, we agree with the Commonwealth that the trial court's instruction on the voluntary nature of Appellant's confession under the totality of the circumstances was appropriate. The trial evidence established that there was a delay of approximately four to six hours between the time Appellant was taken to the police station and when Appellant confessed. However, Appellant did not establish the time of his formal arrest and his arraignment, nor does he forward any arguments on appeal that establish

delay. *Cf. Yandamuri*, 159 A.3d at 530.[10]   Under these circumstances, we cannot conclude that Appellant established any arguable merit to his claim that his trial counsel should have specifically objected or requested an instruction based on an optional suggested jury instruction in 3.04(C).

**(b)   Cautionary Instruction on Appellant's Previous Incarceration**

Appellant next contends that his trial counsel was ineffective for failing to request a cautionary instruction regarding his pre-trial arrest and incarceration.   Appellant argues that this issue has arguable merit because evidence that Appellant committed prior bad acts could have tainted the jury's perception of him as a person of bad character.   Appellant's Brief at 4 (citing, in part, *Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989)).   Appellant asserts that his trial counsel had no reasonable basis for not requesting a cautionary instruction because counsel was "aware of the damaging nature of this evidence and the need to address it." *Id.* at 8.   Appellant continues that, without a cautionary instruction, the jury was permitted to draw improper inferences of his criminal propensity and there was a likelihood that it affected the outcome of the trial. *Id.* at 9.

---

[10] We acknowledge that *Yandamuri* involved a direct appeal in which our Supreme Court held that the record established that the defendant confessed before his formal arrest and arraignment. *Yandamuri*, 159 A.3d at 530. Nevertheless, *Yandamuri* criticized the defendant's claim based on the refusal "to administer an optional suggested standard jury instruction untethered to facts presented at trial." *Id.*  Here, in the context of an ineffectiveness claim, it was Appellant's burden to present facts and arguments regarding the time of his formal arrest and arraignment. This he did not do.

The Commonwealth argues that the evidence that Appellant was in custody on unrelated charges was admissible to show how Appellant "came into contact with police, which led to his subsequent confession to killing the [decedent]." Commonwealth's Brief at 9. The Commonwealth continues that the evidence of Appellant's incarceration was "specifically presented in a way to avoid any undue prejudice to [Appellant]." *Id.* at 10. The Commonwealth notes that neither it nor Appellant presented any details of Appellant's prior charges and that the parties' stipulation included the fact that the charges were withdrawn. *Id.* In a footnote, the Commonwealth asserts that *Billa* is distinguishable because the evidence presented here was not extensive or inflammatory and the Commonwealth did not emphasize it. *Id.* at 10 n.1.

In *Commonwealth v. Hutchinson*, 25 A.3d 277 (Pa. 2011), our Supreme Court considered a claim of ineffectiveness for failing to request a limiting jury instruction regarding prior bad acts. The *Hutchinson* Court rejected the claim, noting:

> This Court has held that when evidence of a defendant's prior criminal conduct or bad acts is admitted, the defendant is entitled upon request to a jury instruction explaining the limited purpose of such evidence.
>
> In *Billa*, we granted the appellant a new trial after concluding that his counsel was ineffective for failing to request a limiting instruction. The appellant had been found guilty of the first-degree murder of a sixteen-year-old girl with whom he had been attempting to establish a relationship. The trial court had admitted, over defense counsel's vigorous objection, testimony concerning a violent sexual assault on a different victim that had been committed by the appellant approximately two months before the murder. The two attacks bore numerous similarities, including the fact that both victims were young Hispanic females.

Although we noted that the testimony of the sexual assault victim was vivid, graphic, highly prejudicial, and potentially emotional, we held that it was properly admitted because of its relevance to proving the appellant's motive and intent and the absence of accident. Nonetheless, we also held that trial counsel was ineffective for failing to request an appropriate limiting instruction. We recognized that the highly inflammatory testimony of the prior sexual assault victim "created the substantial danger that the jury could be swayed in its deliberations . . . by this evidence showing [the] appellant's criminal character and his propensity to sexually assault young Hispanic females." In addition, we recognized that the evidence in question was not merely a fleeting or vague reference to the appellant's criminal record, but rather was extensive as well as inflammatory, comprising a substantial component of the Commonwealth's case and garnering an emphasis in closing argument. Accordingly, "[a]n appropriate limiting instruction . . .  would not have increased the jury's awareness of the prior sexual assault, but it well might have placed its limited legal significance in proper perspective."  We concluded that the **_Billa_** appellant's counsel was constitutionally ineffective for failing to request an appropriate limiting instruction as to the permissible use of evidence of the prior sexual assault, and we therefore awarded the appellant a new trial.

In the instant case, the relevant circumstances have little, if anything, in common with those of **_Billa_**, and we decline to hold that trial counsel was ineffective for failing to request a limiting instruction. The bad acts evidence of which [Hutchinson] complains was not inflammatory, not graphic, and not extensive. Some of the evidence was elicited as a single sentence in passing during cross-examination of the witnesses by defense counsel. In closing argument, the Commonwealth did make reference to [Hutchinson's] abuse of the victim, but did not mention the other bad acts. Under these circumstances, an instruction as to the bad acts evidence may very well have served only to re-emphasize the evidence to the jury. More importantly, [Hutchinson] has not established prejudice, _i.e._, he has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different but for the lack of a limiting instruction. We have previously noted the "overwhelming evidence" of [Hutchinson's] guilt. In light of this overwhelming evidence, which includes eyewitness testimony of the victim's two children, both of whom knew [Hutchinson], [Hutchinson] has failed to suggest how he could have been prejudiced by counsel's failure to request a

limiting instruction such that there is a reasonable probability that the outcome of his trial would have been different. There is no merit to [Hutchinson's] claim of trial counsel ineffectiveness with regard to a limiting instruction . . . .

*Hutchinson*, 25 A.3d at 305-06 (citations omitted).

Instantly, as noted above, the Commonwealth and Appellant made references to Appellant's incarceration at CFCF in reference to Appellant's confession. Appellant and the Commonwealth entered a stipulation indicating that Appellant had been charged in two cases involving possession with intent to deliver a controlled substance. The stipulation further informed the jury that the Commonwealth ultimately withdrew those charges against Appellant.

In light of the foregoing, we discern no basis to conclude that Appellant was entitled to relief on his ineffectiveness claim. As in *Hutchinson*, the prior bad acts evidence was not inflammatory, graphic, or extensive. Moreover, as in *Hutchinson*, we find no basis to conclude that counsel's failure to request a cautionary instruction regarding Appellant's pre-arrest incarceration resulted in prejudice, where, as here, Appellant's confession was properly before the jury. Therefore, Appellant's argument fails.

### (c) Self Defense Jury Instructions

Appellant next claims that trial counsel was ineffective for failing to request a jury instruction on self-defense or voluntary manslaughter based on a theory of imperfect self-defense. Appellant's Brief at 23, 26. Appellant asserts that there was evidence in his confession and statements to Burnett

that he believed the decedent was armed and was about to shoot him. ***Id.*** at 25-26.

The Commonwealth responds that the record contained no basis for Appellant to claim self-defense or imperfect self-defense. Commonwealth's Brief at 19. The Commonwealth emphasizes that Appellant initiated and facilitated the circumstances which led to his participation in the conspiracy to rob the decedent using a firearm. ***Id.*** at 18.

Our Supreme Court outlined the requirements of self-defense and imperfect self-defense as follows:

> To prevail on a justification defense, there must be evidence that the defendant "(a) . . . reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." ***[S]ee*** 18 Pa.C.S. § 505 . . . . "The Commonwealth sustains its burden [of disproving self-defense] if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger."
>
> The derivative and lesser defense of imperfect belief self-defense "'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter.'" Thus, for example, if the defendant was not free from fault, neither self-defense nor imperfect self-defense is a viable defense.

*Commonwealth v. Sepulveda*, 55 A.3d 1108, 1124-25 (Pa. 2012) (some citations and footnote omitted).

Following our review, we agree with the PCRA court's conclusion that "the evidence did not meet the criteria for either of the defenses of justification and/or voluntary manslaughter." PCRA Ct. Op. at 6. We add that Appellant's claim focuses on evidence which he believes supports his contention that the decedent was armed. However, even assuming that the decedent was armed, the record does not support Appellant's claim that he was free from fault in provoking the encounter. To the contrary, the evidence at trial that Appellant helped plan the robbery of the decedent and that he carried out the robbery, during the course of which Appellant approached the decedent from a hiding spot and then shot and killed him. Therefore, self-defense and imperfect self-defense were not viable defenses, and Appellant's ineffectiveness claim failed for lack of arguable merit.

### Appellant's Fifth Issue Concerning Counsel's Ineffectiveness for Failure to Challenge the Weight of the Evidence

Appellant next asserts that trial counsel was ineffective for failing to challenge the weight of the evidence because he would have likely prevailed on this claim. Appellant's Brief at 28-29. Appellant emphasizes that "[t]his was a cold case with no physical evidence" and that the Commonwealth relied on "flimsy and questionable evidence" from Appellant's co-conspirator. *Id.* at 29. Appellant recites numerous reasons why Burnett's testimony was unworthy of belief. *Id.* at 29-30.

The Commonwealth responds that Appellant failed to demonstrate that he asked trial counsel to file a post-sentence motion.[11]  Commonwealth's Brief at 19.  Nevertheless, the Commonwealth notes that trial counsel did file a post-sentence motion.  *Id.*  The Commonwealth further argues that Appellant's intended challenge to the weight of the evidence lacked arguable merit because Appellant failed to acknowledge his own confession.  *Id.* at 20-21.

A review of the record confirms that Appellant's trial counsel filed a timely post-sentence motion, which included claims that the verdict was against the weight of the evidence based on inconsistencies in Burnett's testimony and his motives for testifying against Appellant.  *See* Post Sentencing Motion for New Trial and/or Arrest of J., 12/28/09, at ¶¶ 2-3.  Therefore, the record belies Appellant's claim that trial counsel was ineffective for failing to challenge the weight of the evidence.[12]  Therefore, Appellant's claim must fail.

_____

[11] We note that the Commonwealth and the PCRA court appear to construe Appellant's ineffectiveness claim as an attempt to have his post-sentence motion rights reinstated.  *See* Commonwealth's Brief at 19; PCRA Ct. Op. at 7.

[12] Because trial counsel filed a post-sentence motion challenging the weight of the evidence, Appellant's ineffectiveness claim is more properly directed to direct appeal counsel's failure to pursue a challenge to the weight of the evidence on direct appeal.  Appellant, however, did not develop a claim that direct appeal counsel was ineffective.  *See* Appellant's Brief at 30.

In any event, we agree with the Commonwealth and the PCRA court that Appellant's underlying weight claim lacked arguable merit. Accordingly, no relief is due.

### Appellant's Sixth Issue Concerning Counsel's Ineffectiveness for Failure to Meet and Provide Discovery

Appellant next asserts that the PCRA court erred in dismissing his claim that trial counsel did not meet with Appellant and "show [Appellant] the discovery in his case" until three days before trial. Appellant's Brief at 34. Appellant acknowledges that he "arguably had the advice of counsel," but contends that "it is unreasonable for a homicide defendant to have only three days in which to prepare himself for trial." *Id.* at 35. Appellant states that "[b]ecause this violation of [his] due process rights is plain on its face, a new trial is warranted regardless of whether more time might have yielded a different outcome . . . ." *Id.*

The Commonwealth asserts that, aside from asserting that trial counsel's actions were "*prima facie* unreasonable[,]" Appellant "failed to elaborate this claim in any meaningful fashion and never provided any offer of proof to substantiate his claim." Commonwealth's Brief at 25. The Commonwealth argues:

> [Appellant] identified no additional information he would have supplied had counsel met with him earlier, let alone anything satisfying the prejudice requirement for an ineffective assistance of counsel claim. Instead, [Appellant] suggests that this is a due process violation that warrants a new trial, without any showing of actual prejudice. [Appellant] cites no authority to support his argument, and indeed, such claims have been rejected by the Pennsylvania Supreme Court. *Commonwealth v. Mason*, 741

A.2d 708, 715, 716 (Pa. 1999), *abrogated on other grounds* ("it is well settled that, by itself, the amount of time an attorney spends consulting with his client before trial is not a legitimate basis for inferring the total extent of counsel's pre-trial preparation, much less the adequacy of counsel's preparation"). Contrary to [Appellant's] argument, he was not exempt from establishing prejudice. He failed to do so, and therefore, the PCRA court properly denied this claim.

*Id.* at 26.

Instantly, the record shows that Appellant's trial counsel raised this issue in a motion for continuance before jury selection. Appellant testified that trial counsel "brought" the discovery material to him on the Saturday before October 13, 2009, the Tuesday when jury selection started. *See* N.T., 10/13/09, at 5. Appellant stated that he did not have a chance "to really look it over" but that he was able to talk to trial counsel on the Saturday and Monday before jury selection. *Id.* Appellant testified that there were "a lot of things [he did not] understand" and that he did not know anything about his own case. *Id.* at 6.

The trial court denied the motion for continuance, after which the Commonwealth stated that it had provided discovery to Appellant's prior counsel. *Id.* at 6-7. The matter thereafter proceeded to jury selection. *Id.* at 7.

In reviewing Appellant's claim of ineffectiveness, the PCRA court concluded:

Appellant does not indicate any sort of prejudice that may have occurred due to the lack of time. Without showing of actual prejudice, a new trial cannot be ordered on the mere potential for

a different outcome. ***Commonwealth v. Harvey***, 812 A.2d 1190, 1196-97 [(Pa. 2002)].

Therefore, this claim is without merit.

PCRA Ct. Op. at 8.

Following our review, we agree with the Commonwealth's assertion that Appellant's argument is underdeveloped. Aside from citing the due process clause of the Fourteenth Amendment and parenthetically quoting Article I, Section 9 of the Pennsylvania Constitution, Appellant cites no case law discussing trial counsel's inadequate consultation and the failure to provide discovery materials in a timely fashion. Moreover, Appellant fails to provide meaningful discussion of the record, nor is there support for his assertion that trial counsel failed to meet with him prior to trial. In short, Appellant has failed to develop a claim that that he is entitled to a new trial based on a violation of his due process rights or actual prejudice. ***Cf. Commonwealth v. Johnson***, 51 A.3d 237, 243-46 (Pa. Super. 2012) (*en banc*) (rejecting a PCRA petitioner's arguments that he was entitled to presumptions of prejudice based on an ineffective assistance counsel claim of inadequate consultation); ***Commonwealth v. Brown***, 145 A.3d 196, 207 (Pa. Super. 2016) (discussing a claim regarding trial counsel's failure to have any in-person consultation with the PCRA petitioner). Therefore, we are constrained to find Appellant's argument waived. ***See*** Pa.R.A.P. 2119(a); ***Kane***, 10 A.3d at 331-32.

**Appellant's Seventh Issue Concerning Counsel's Failure to Challenge Trial Court's Ruling Denying Appellant's Family Presence during *Voir Dire***

Appellant's final claim of ineffectiveness arises out of the following exchange that occurred before jury selection:

[Appellant's Trial Counsel]: I have family present in the courtroom. May they be able to sit in the courtroom during jury selection?

THE COURT: Not during jury selection.

N.T., 10/13/09, at 7-8. Nothing in the record indicates that the trial court issued a ruling closing jury selection to the public or otherwise explains why Appellant's trial counsel made the foregoing request. Moreover, Appellant's trial counsel did not object at the time of the trial court's ruling, renew a request for Appellant's family to be present, or otherwise assert that Appellant's family had a right to be present for jury selection.

In his amended PCRA petition, Appellant asserted that trial and direct appeal counsel were ineffective for failing to challenge the trial court's refusal of his request to have his family present during *voir dire*. **See** Am. PCRA Pet. at 31-33. The PCRA court explained that it dismissed Appellant's claims because, "Exclusion of family members does not meet the Sixth Amendment standard of deprivation." PCRA Ct. Op. at 8. The PCRA court further concluded that Appellant failed to demonstrate prejudice to sustain his claims of ineffective assistance of counsel. **Id.**

On appeal, Appellant essentially restates his claim that trial and direct appeal counsel were ineffective for failing to challenge the exclusion of his

family from jury selection. Appellant's Brief at 35. As in the PCRA court, Appellant conflates the two claims of trial counsel and direct appeal counsel's ineffectiveness.[13] First, Appellant contends that direct appeal counsel was ineffective for failing to challenge the trial court's ruling. *Id.* at 38. Appellant emphasizes that the improper exclusion of members of the public constitutes "structural error" and could have been raised as such in Appellant's direct appeal without having to prove actual prejudice. *Id.* at 37-38. Second, Appellant argues that "[t]o the extent that this error is not deemed preserved" by trial counsel, "such failure is just another example of trial counsel's ineffectiveness." *Id.* at 38. Appellant claims that "he should be afforded a new trial, or at a minimum, reinstatement of his appellate rights *nunc pro tunc*." *Id.*

The Commonwealth responds that the PCRA court properly denied Appellant's claim. Commonwealth's Brief at 29. The Commonwealth claims

_____

[13] A claim of ineffective assistance of direct appeal counsel requires a PCRA petitioner to establish the general elements of arguable merit, a lack of reasonable basis, and prejudice. *See Commonwealth v. Blakeney*, 108 A.3d 739, 749 (Pa. 2014). Our Supreme Court has noted:

> With regard to "reasonable basis" in the appellate context, "[i]t is well settled that appellate counsel is entitled, as a matter of strategy, to forego even meritorious issues in favor of issues he believes pose a greater likelihood of success." To establish . . . prejudice in the appellate representation context, the petitioner must show that there is a reasonable probability that the outcome of the direct appeal proceeding would have been different but for counsel's deficient performance.

*Id.* at 750 (citation omitted).

that Appellant failed to establish the reasonable probability of a different outcome at trial. *Id.* at 27. Citing several federal court decisions, the Commonwealth also claims that Appellant failed to establish that the trial court's ruling "was so serious as to render his trial fundamentally unfair." *Id.* at 27-28.

At the outset, it is helpful to review the United States Supreme Court decision in *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), as the PCRA court, Appellant, and the Commonwealth cited that decision in support of their respective positions. In *Weaver*, the trial court brought the entire pool of potential jurors into a courtroom that could only seat some of the pool members. *Id.* at 1906. Consequently, a court officer turned away members of the public who were not part of the jury pool from being seated in the courtroom, and the petitioner's mother and her minister were excluded from the courtroom. *Id.* Although the petitioner's mother informed counsel that she was turned away, counsel did not object with the trial court. *Id.* Following his conviction, the petitioner asserted that his counsel was ineffective for failing to object to the closure of the courtroom. *Id.* The state court denied relief and the petitioner's appeal. *Id.* at 1906-07. The United States Supreme Court granted *certiorari* to resolve a disagreement regarding the proper standard of prejudice for a structural error that was "neither preserved nor raised on direct review but [was] raised later via a claim alleging ineffective assistance of counsel." *Id.* at 1907.

The **Weaver** Court held that when raising an ineffectiveness claim, a petitioner must demonstrate prejudice. **Id.** at 1911. The High Court reasoned:

Despite its name, the term "structural error" carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was "harmless beyond a reasonable doubt." Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to "automatic reversal" regardless of the error's actual "effect on the outcome."

The question then becomes what showing is necessary when the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim. To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards. First, the defendant must show deficient performance—that the attorney's error was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." **Strickland v. Washington**, 466 U.S. 668, 687 . . . (1984). Second, the defendant must show that the attorney's error "prejudiced the defense."

The prejudice showing is in most cases a necessary part of a **Strickland** claim. The reason is that a defendant has a right to effective representation, not a right to an attorney who performs his duties "mistake-free." As a rule, therefore, a "violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced."

That said, the concept of prejudice is defined in different ways depending on the context in which it appears. In the ordinary **Strickland** case, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." But the **Strickland** Court cautioned that the prejudice inquiry is not meant to be applied in a "mechanical" fashion.

*Id.* at 1910-11 (some citations omitted).[14] The majority opinion in **Weaver**, stated that it assumed the petitioner's argument that prejudice in an ineffectiveness claim could be demonstrated by a showing that the defendant's trial was "fundamentally unfair" was "the correct one." *Id.* at 1911. However, the majority opinion stated that the Court did not decide whether to recognize a fundamentally unfair prejudice standard in addition to the "ordinary" showing that the outcome at trial could have been different. *Id.*

Instantly, Appellant's trial counsel's failure to object to the trial court's terse denial of his request to have family members present, did not preserve Appellant's constitutional challenge based on the open courts. As noted above, nothing in the record establishes that the trial court closed the courtroom. While the trial court should have explained its decision to refuse Appellant's request, trial counsel's failure to object essentially deprived the trial court to cure its ruling at the first opportunity. Therefore, Appellant's trial counsel failed to preserve a challenge to the trial court's exclusion of his family members for direct appeal. **See** Pa.R.A.P. 302(a).

Under these circumstances, we conclude that Appellant's claim of direct appeal counsel's ineffectiveness must fail, as direct appeal counsel cannot be held ineffective for failing to raise a waived claim. **See Commonwealth v. Spotz**, 18 A.3d 244, 278, 281 (Pa. 2011); **accord Weaver**, 137 S. Ct. at

---

[14] This Court may apply federal precedent to the prejudice inquiry. **Commonwealth v. Pou**, 201 A.3d 735, 740 n.2 (Pa. Super. 2018), *appeal denied*, 208 A.3d 458 (Pa. 2019).

1912 (explaining that one of the reasons for requiring proof of prejudice in a claim of trial counsel's ineffectiveness is that a contemporaneous objection permits the trial court to open a courtroom or explain the reasons for closing it, while a claim of trial counsel's ineffectiveness deprives the trial court of the ability to cure the violation). Accordingly, we next consider whether Appellant established a claim of trial counsel's ineffectiveness.

As **Weaver** holds, Appellant's ineffectiveness claim required him to show actual prejudice in terms of the outcome of trial or the fundamental fairness of the trial. **See Weaver**, 127 S. Ct. at 1911. Appellant instead focuses on "structural error" for the purposes of his claim of direct appeal counsel's ineffectiveness and merely asserts that trial counsel's ineffectiveness resulted in a waiver of his direct appeal claim. As noted by the PCRA court and the Commonwealth, Appellant fails to establish any actual prejudice resulting from trial counsel's ineffectiveness. Therefore, we agree the PCRA court's conclusion that Appellant's claim of trial counsel's ineffectiveness failed to establish actual prejudice.

For these reasons stated herein, we conclude that Appellant is not entitled to relief, and we affirm the PCRA court's decision dismissing Appellant's petition without a hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/25/2021</u>